Robert MORRIS et al., Appellants,

v.

WERNER–CONTINENTAL, INC., et al., Appellees.

No. 71–2044.

United States Court of Appeals, Sixth Circuit.

Sept. 20, 1972.

Stanley H. Sidicane, Nashville, Tenn., on brief for appellants.

George W. Weber, Jr., Cincinnati, Ohio, Sorrell Logothetis, Dayton, Ohio, for appellees; Jack B. Josselson, Schmidt, Effron, Josselson & Weber, Cincinnati, Ohio, Sorrell Logothetis, and Robert C. Knee, Knee, Snyder & Parks, Dayton, Ohio, on brief.

Before PHILLIPS, TUTTLE,* and O'SULLIVAN, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal presents principally the question whether employees who are bound by arbitration provisions of a labor contract, having submitted a grievance to arbitration as provided in the contract, may appeal to the courts when it appears that the arbitration committee may have made an egregious error in the interpretation of terminology which controls the dispute.

The issue is further complicated because of the circumstance that the rights of the complaining employees are to be fixed, under their bargaining agreement, by terminology used between their employer and another corporation and under such circumstances, it is doubtful that the employees complaining in this action have the standing to prevent a practical rewriting of the contract which fixes their rights as to seniority by the introduction of parol evidence completely changing the terminology used in the contract between the two corporations.

The following facts seem undisputed; in any event they are to be taken most strongly in favor of the appellants-employees of Continental Truck Lines because the trial court dismissed their complaint on the ground that the court would not interfere with a determination by the Ohio Joint State Grievance Committee of the International Brotherhood. In 1967, after considerable negotiation, a "plan and agreement of merger" was entered into between Werner

* Elbert P. Tuttle, Senior Circuit Judge, United States Court of Appeals, Fifth Circuit, sitting by designation.

Transportation Company and Continental Transportation Lines, Inc. This agreement was denominated throughout as a merger of the two companies, thus giving rise to the issue here. After the agreement was signed, but before it had gone into effect, the question was raised as to the seniority status of the Continental employees, principally drivers, under the newly organized Werner-Continental, Inc. Both parties agreed that the Ohio Joint State Grievance Committee had established rules governing seniority as follows:

> "The established Ohio practice is that employees of the *purchased* company are placed at the bottom of the seniority list of the purchasing company. The past practice shall continue to apply to all Ohio domiciled employees, except in the event of *merger* when the seniority of the employees affected shall be dovetailed by chronological listing unless otherwise mutually agreed to by the parties."

The trial court found "in 1967 the Werner Transportation Company and Continental Transportation Lines, Inc. entered into a *statutory merger agreement*, which was subsequently approved by the respective stockholders. The new company was known as Werner-Continental, Inc., but, in fact, the Werner Transportation Company was the survivor, operations removed from the Continental terminals to the Werner terminals, and the Werner managers were retained in their former positions, while the Continental managers were delegated to an assistant manager position. Mr. Werner retained full control of the newly merged company. The evidence shows that Werner was at all times a successful, prosperous company, while Continental was in financial difficulty."

While we do not recognize the relevance of the findings beginning with "but in fact the Werner Transportation Company was the survivor," they are not quite accurately stated. Werner-Continental, Inc. was the survivor and it was the survivor with additional common capital stock authorized, and had issued a very substantial amount of preferred stock, which was exchanged for the stock of Continental and which was convertible into common stock of Werner-Continental upon the election of its owners. Moreover, it appears that the former president of Continental was chairman of the board of the new corporation, although having very limited operational duties to perform. It is apparent that the reference made by the trial court to the success of the one corporation and the financial difficulties of the other bears upon some tests that are occasionally utilized to determine whether there has actually been a purchase of a defunct or failing corporation by a successful one. This is unimportant in this case, because there is no proof that Continental was in a *failing or insolvent* condition, although they had suffered losses during a period shortly before the "merger."

Both companies being engaged in land transportation, it was necessary for an application for permission to create the merger to be submitted to the Interstate Commerce Commission for its approval. The application to the Interstate Commerce Commission designated the proposal as a "merger," and the order issued by that Commission also carried that designation. It is not evident, however, from anything in the record that it would have been of any significance in the treatment of the matter by the Interstate Commerce Commission had the application indicated that Werner wished to purchase Continental.

Mr. Werner, who at all times, both before and after the accession of Continental, was the managing head of Werner and of Werner-Continental, testified very frankly that the agreement to cast the association of the two entities in the form of a "merger" was a deliberate choice. He stated that he had tried to buy Continental as an outright purchase. He never made it clear, however, in his testimony, whether he wished for his company to purchase the assets subject to liabilities, or purchase the assets clear of liabilities, or to purchase the common

stock from the stockholders of Continental. In other words, there is nothing in this record to indicate what it was Werner considered his company had purchased.

The merger agreement called for the surrender of all of the common stock of Continental in return for preferred stock of Werner-Continental, Inc. convertible into common stock on a specified ratio. This is what is known as a tax-free reorganization for income tax purposes, and Mr. Werner testified that he was unable to make a purchase because Mr. Harris, the president of Continental, refused to proceed on that basis on advice of his counsel. The second reason given was employee morale, that is to say, the morale of the Continental employees, the very people who are now complaining. It is clear that the effect of Mr. Werner's testimony is that he was told by Mr. Harris of Continental that they would have to "call the deal" a "merger" because the employees would be unhappy if, instead, Continental were in some way being sold out to Werner. The significance of this deception is that it was of great importance to the employees of Continental, in determining their course of action towards their employer, Continental, up to the time of the association of the two companies into one, to know whether they were to be dovetailed into the seniority system of the new corporation, which would be the case if it were a merger, as they were being told, or put at the bottom of the seniority list, as would be the case if it were a sale by Continental and a purchase by Werner, which they were objecting to.

So we come up to the day of effective reorganization and for the first time the question is raised by Continental drivers who, naturally, wish to know what their seniority status is to be. They are first told by a letter from Mr. Werner that the transaction was a "merger" and they therefore would be dovetailed into the seniority list along with the Werner employees. Later, without any hearing of any sort, the committee received a correcting letter from Mr. Werner in which he stated that the transaction was a purchase and not a merger; thereupon, the committee set the matter down for hearing on a grievance or series of grievances that had been filed in the meantime by some of the drivers of Continental, the parties who are now sponsoring this action.

During the consideration of the contention of Mr. Morris and his fellow Continental drivers that the transaction between the two carriers had been a merger, the following facts became apparent. The Vice President of Werner originally wrote to the Ohio Joint State Committee (hereafter OJSC) stating that the transaction was a "merger", and that the seniority list would be dovetailed. He later wrote the Chairman of the OJSC stating that this determination of his had brought him a flood of complaints from his own drivers and that upon further consideration he was writing to advise the Committee that the transaction was a "purchase", and that the Continental drivers would be placed at the bottom of the seniority list. Thereafter, at a hearing of the Committee, Mr. Morris introduced into the record copies of the minutes of Werner authorizing a "merger" with Continental, an application by Werner, over the signature of its president, to the Interstate Commerce Commission asking permission to enter into a "merger", a notice to the stockholders of Werner, telling them of the plans for the "merger" with Continental, application to the Securities and Exchange Commission for a change in the name of Werner to Werner-Continental, in which the transaction is referred to as a "merger," and finally a statement to stockholders in which the same terminology is used. The court can well get the feeling that what was done by the OJSC was simply to follow the dictates of Mr. Werner, even when he changed his mind, for, finally, following a May 15th session, the Chairman of the Committee announced

the unanimous vote of the Committee as follows:

"Following careful examination and consideration of all evidence submitted and after further investigation and consultation with legal counsel, it is the decision of the Ohio Joint State Committee that Werner Transportation Company did in fact purchase Continental Transportation Lines and the employees of Continental Transportation Lines are properly placed at the bottom of the consolidated seniority list of Werner-Continental, Inc. at the specified terminal points in accord with the established practice."

The plaintiffs do not contest the validity or effectiveness of the provisions in the National Master Freight Agreement establishing the grievance machinery, nor do they contest the applicability of the "practice" quoted above which provides that where two employers are joined by merger the employees are dovetailed for seniority purposes, whereas if they are joined by purchase the employees of the purchased company go at the bottom of the list. Their contentions here are, in effect, two-fold. The first contention is that the order of the ICC, which is an essential for the carrying on by the new Werner-Continental, Inc. of its transportation business, is res adjudicata of the fact that this was a "merger" and not a "purchase" by Werner of Continental. The second is that there were defects in the OJSC proceedings which make it null and void.

The trial court stated:

"This court cannot and will not decide whether there was a merger or purchase in this case." Citing [United] Steel Workers v. American Manufacturing Company, 363 U.S. 564 [80 S.Ct. 1343, 4 L.Ed.2d 1403], together with [United] Steel Workers v. Warrior and Gulf [Navigation] Company, 363 U.S. 574, [80 S.Ct. 1347, 4 L.Ed. 2d 1409] and [United] Steel Workers v. Enterprise [Wheel & Car] Corp., 363 U.S. 593, [80 S.Ct. 1358, 4 L.Ed. 2d 1424] 1960.

■ Little need be said with respect to the contention of the appellants that the action of the Interstate Commerce Commission was res adjudicata as to the proper relationship between Werner and Continental at the time they became one. That is, whether this was a "merger" or "purchase." That was not an issue before the Interstate Commerce Commission. Appellant concedes that if the application filed with the ICC had stated it to be a "purchase" instead of a "merger", it would have made no difference. Thus, there was no contested issue as to which the order of the ICC undertook to offer a solution dealing with this problem.

With respect to the contention that certain procedural requirements were not met and that the Union breached its duty of fair representation of these particular appellants, we think it necessary to say that there were findings by the trial court rejecting these contentions. In the first place the court found that "the plaintiffs waived any objections they may have had to the alleged irregularities", citing Order of Railway Conductors v. Clinchfield R.R. Company, C. A.6, 1969, 407 F.2d 985. In the *Clinchfield* case, this court held that the plaintiff had waived objections to the size of the Arbitration Board by acquiescence to the arbitration. With respect to the allegations that the Union representatives on the Joint Committee were either biased or had a conflict of interest or failed actively to present the contentions of the Continental drivers, the trial court said:

"On the facts of this case we cannot find the requisite fraud, collusion, bad-faith, or hostile discrimination

. . . .

"The Union was in a difficult position in this case. It was charged with the duty of representing both the former Werner employees and the former Continental employees. The evidence shows that three of the four locals involved took a neutral position on the seniority question. The fourth local actively tried to secure a dove-

tailed seniority list, as does plaintiff. The position of neutrality did not prevent the locals from processing grievances to the OJSC, thereby setting the stage for a full and final decision on the merits. Neutrality in this situation does not show bad faith any more than it shows breach of duty of fair representation (citing Bieski v. Eastern Automobile Forwarding Company, 3 Cir. 1968, 396 F.2d 32). It is probably the most prudent position for a Union to take in this situation . . . .

"In summary, we hold that the bargained for arbitration procedure was adequate to provide, and actually did provide, a fair decision; and that plaintiff did not sustain his burden of proof that the Union breached its duty of fair representation."

The recurrent theme which runs through appellants' brief and argument is that it simply can't be possible for the courts to permit the Continental drivers to be deprived of the rights to which they are entitled under the Ohio Past Practice by being dovetailed as to seniority with the drivers of Werner under the circumstances of this case. Although not saying so in so many terms, their argument runs to the proposition that it can be nothing more than an *ipse dixit* for the OJSC, purely on the say-so of Mr. Werner or some lawyer's advice, to say that when all of the documents relating to the affiliation between the two companies were admittedly in terms of "merger" this was no merger at all, but was purchase of some undescribed property.[1] It is extremely difficult for us to see how the OJSC could translate or transform the merger that actually took place into a purchase. However, perhaps unfortunately for the Continental drivers, but, also, fortunately for the promotion of industrial peace in general, it is not our place to decide this issue, nor was it the function of the trial court.

■ If any principle is generally recognized in labor relations these days, it is that the grievance procedures, leading ultimately to arbitration, if provided in a labor contract, as they most always are, are to be given the broadest possible construction. The law is well settled in this regard, since the three Supreme Court decisions, United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960). As pointed out by the Supreme Court in those cases, the process of hearing and passing on grievances is part of the regular warp and woof of industrial labor-management relations. When the parties agree to contracts such as the National Master Freight Agreement, which has the explicit provision to the effect that questions of seniority shall be subject to grievance procedures, the courts will not only refrain from hearing appeals from the awards of such arbitration as may finally result in such grievance matters, but courts will, by injunction, require the parties to proceed with the arbitration proceedings in the event either of them should decline to do so.

■ This group of cases teaches us another thing as well—that is, that so long as there is an absence of fraud or bad faith or demonstrated bias or collusion, the decision by the arbitrators or, here, the Joint Committee, is final and

---

1. We use this terminology because nowhere in the record is any effort made to explain what it is that even Mr. Werner thought the Werner Company had purchased. Certainly it didn't purchase the rolling stock or the terminals or the charter or the good will, or even the stock from the Continental stockholders. The latter was particularly avoided, because as we read the testimony, it is plain that the transaction was cast in the form of a taxfree reorganization for income tax purposes.

binding and courts are generally powerless to interfere. It became the duty of the Joint Committee here to determine what the parties to the National Master Freight Agreement meant when they spoke of a "merger" and of a "purchase." While, as we have said, it would appear very difficult for any court to hold that on the record which we have disclosed above, there was anything other than a "merger" in the ordinary legal sense, it turns out that the members of the committee, in solving a labor dispute, are not restricted to the legal terminology that would be binding on courts. Neither are they restricted to the written contracts between two parties, neither of whom is before the court. In sum, we conclude that having found the fact relating to the fairness of the proceedings as it did, the court properly declined to set aside the decision of the Ohio Joint State Committee. This decision by the court was fully justified by the language of the Supreme Court's opinion, "Words in a collective bargaining agreement, rightly viewed by the court to be the charter instrument of a system of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion. The Court, therefore, avoids the prescription of inflexible rules for the enforcement of arbitration promises. Guidance is given by identifying the various considerations which a court should take into account when construing a particular clause—considerations of the milieu in which the clause is negotiated and of the national labor policy. It is particularly underscored that the arbitral process in collective bargaining presupposes that the parties wanted the informed judgment of an arbitrator, precisely for the reason that judges cannot provide it. Therefore, a court asked to enforce a promise to arbitrate should ordinarily refrain from involving itself in the interpretation of the substantive provisions of the contract."

The judgment is affirmed.