529 F.2d 793
 91 L.R.R.M. (BNA) 2241, 42 A.L.R.Fed. 54,
78 Lab.Cas. P 11,217
 BARTON BRANDS, LTD., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Edward Humes, Intervenor.
DISTILLERY, RECTIFYING, WINE AND ALLIED WORKERS'
INTERNATIONAL UNION OF AMERICA, LOCAL 23, AFL-CIO,
Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Cross-Petitioner,
v.
BARTON BRANDS, LTD., and Distillery, Rectifying, Wine and
Allied Workers' International Union of America,
Local 23, AFL-CIO, Cross-Respondents.
 Nos. 74--2082, 75--1102 and 75--1136.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 25, 1975.
Decided Jan. 16, 1976.
 
 Herbert L. Segal, Louisville, Ky., for Distillery Workers' Union Robert Plotkin, Chicago, Ill., H. Douglas Laycock, Austin, Tex., for Barton Brands.
 Richard S. Barlow, Bardstown, Ky., for intervenor.
 Elliott Moore, Deputy Associate Gen. Counsel, Michael S. Winer, Marion Griffin, Attys., National Labor Relations Board, Washington, D.C., for N.L.R.B.
 Before HASTINGS, Senior Circuit Judge, SPRECHER and BAUER, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 This case is before the Court on the petitions of Barton Brands, Ltd. ('Barton'), and Distillery, Rectifying, Wine and Allied Workers' International Union of America, Local 23, AFL-CIO (the 'Union'), for review of an order of the National Labor Relations Board,[1] and on the Board's cross-application for enforcement of its order.[2] The basic issues are:
 
 
 2
 (1) whether substantial evidence supports the Board's findings that the Union committed an unfair labor practice in violation of Sections 8(b)(2) and 8(b)(1) (A) of the National Labor Relations Act, as amended (the 'Act'),[3] by successfully negotiating with Barton for an agreement partially endtailing on the seniority list of the unit a small group of employees whose seniority had previously been dovetailed with the majority of employees, and
 
 
 3
 (2) whether substantial evidence supports the Board's finding that Barton committed an unfair labor practice in violation of Sections 8(a)(3) and 8(a)(1) of the Act by agreeing to the endtailing proposal presented by the Union.
 
 I.
 
 4
 Before the events transpired which precipitated this litigation, the employees who were adversely affected by the change in seniority provisions in the Barton contract were employed by the Glencoe Distilling Company and were members of a different unit of the Union. On August 31, 1969, Glencoe sold all its assets and plant facilities to Barton.[4]
 
 
 5
 Shortly after the sale, Barton and the Union began negotiations regarding integration of the bargaining units at the two plants. At separate meetings for the Barton and Glencoe employees, Paul Kraus, Barton's Chief Operations Officer whose duties included the handling of labor relations, explained that Barton's business was expanding and that the firm, among other developments, planned to build a new bottling facility at the site of the Glencoe plant. He told the employees that he felt their best interests would be served if the two units were integrated and the employees' seniority dovetailed; i.e., former Glencoe employees would be given full credit for seniority accumulated at Glencoe and both groups of employees would be placed on one combined seniority list.[5] Both the Barton and Glencoe employees voted in favor of dovetailing and the collective bargaining agreement between Barton and the Union was amended to reflect the plan.
 
 
 6
 Barton did not build the new facility. Within a year of the purchase, engineering studies showed the site to be unfeasible for bottling. A plan to build on a different site was abandoned when Barton sold its Canadian Mist brand, which accounted for about one-third of its business. Following these events, Barton laid off some employees and other employees began to worry about their job security.[6] One manifestation of this apprehension was a dissatisfaction among some Barton employees with the dovetailing of the former Glencoe employees, which they saw as causing employees to be laid off despite having worked at Barton longer than employees who had received credit for their time worked at Glencoe.
 
 
 7
 In the months before June, 1972, the expiration date of the Barton collective bargaining agreement, the Union leadership canvassed the unit employees requesting suggestions for contract changes. One of the suggestions received was a proposal that the former Glencoe employees be endtailed; i.e., that they be placed on the seniority list below all Barton employees who were hired before Barton's purchase of Glencoe.[7] The Union presented the proposal to Barton during negotiations. Although Barton first rejected it, expressing some doubts about its legality, the parties ultimately agreed that for the purposes of lay off and recall, the seniority of the former Glencoe employees would be calculated from September 1, 1969, the day Barton acquired the Glencoe site. For all other purposes, including choice of jobs while working, vacations, and other benefits, the dovetail provision remained in effect.[8] The parties reached agreement on September 22, 1972, and the Union membership ratified the contract on October 12.
 
 
 8
 During the period from the commencement of negotiations for the new agreement until the ratification of the agreement by the Union membership, there was an average of 223 active employees on the Barton payroll, twelve of whom were former Glencoe employees.[9] As a result of the endtailing provision in the contract, twelve former Glencoe employees suffered lay offs that would not have occurred if they had been permitted to retain their seniority from Glencoe.[10]
 
 
 9
 At the request of a laid off former Glencoe employee, the Board's General Counsel filed complaints against the Union and Barton charging them respectively with violations of Sections 8(b)(2) and 8(b)(1)(A) and Sections 8(a)(3) and 8(a)(1) of the Act. After a hearing, the Administrative Law Judge dismissed the complaints on the grounds that the endtailing proposal was a reasonable resolution of a dispute between two groups of represented employees and that the Union acted without bad faith or dishonesty.[11]
 
 
 10
 The Board reversed the Administrative Law Judge, finding that the Union breached its duty of fair representation by effecting the reduction in seniority and the lay off of the former Glencoe employees 'largely, if not solely, for the reason to advance the political cause of Union official Ken Cecil.' 213 N.L.R.B. No. 71 at 5. They found Barton liable for acquiescing in the Union breach.
 
 
 11
 The Board reached its finding regarding the Union's motivation on evidence which indicated that Cecil, Vice-President of Local 23 and the highest Union officer at Barton during the period involved, attended a January 1972 meeting with an international vice-president of the Union at which some Barton employees discussed the elimination of the dovetailing agreement, was part of a group that obtained an attorney's opinion concerning the legality of eliminating the agreement, presented the endtailing proposal to the Union contract negotiating committee, and claimed responsibility for the proposal during the contract negotiations and during his successful campaign for reelection to his Union office in November and December, 1972, which immediately followed the signing of the new contract.
 
 
 12
 In this review of the Board decision, the Union alleges that (1) there is not substantial evidence on the record to support the finding that the Union changed the Glencoe employees' seniority in order to further Cecil's political ambitions, (2) the change in seniority could not have violated Section 8(b)(2) of the Act since the Glencoe employees were not discriminated against on the basis of union membership or activity, and (3) even if the seniority change was illegal discrimination under Section 8(b)(2), the Union's good faith is a defense to the charge against it.
 
 
 13
 Barton challenges the Board order on the same grounds as the Union and argues further that the complaint against it is barred by the six month statute of limitations in Section 10(b) of the Act and that the Board did not make the requisite finding of an improper motive for Barton's acquiescence in the change.
 
 II.
 
 14
 The Union and Barton contend there is not substantial evidence on the record to support the Board's finding that the Union effected the change in seniority in order to advance the political ambitions of Union official Ken Cecil.[12]
 
 
 15
 The record does not support such a finding. The Board's determination that Cecil championed the endtailing of the former Glencoe employees to curry favor with the majority of the Barton employees in order to enhance his candidacy in the upcoming election is sustained by the evidence, but the Board's reasoning that Cecil's efforts are chargeable to the Union as a whole and that the enhancement of the Cecil candidacy was the motivating factor behind the endtailing decision is not borne out by the evidence.
 
 
 16
 A union officer's conduct is attributable to the union when he acts as an 'agent' for the union, 29 U.S.C. § 158(a), i.e., when he acts within the scope of his general authority as an officer. International Ladies' Garment Workers' Union v. N.L.R.B., 99 U.S.App.D.C. 64, 237 F.2d 545, 551 (1956); International Longshoremen's Union (Sunset Line & Twine Co.), 79 N.L.R.B. 1487 (1948). Cecil's actions, which the Board attributes to the Union, were not undertaken in his capacity as a union officer but were undertaken in his own behalf as a candidate for union office. The only activity which the Board cites that Cecil undertook in his capacity as an officer was the presenting of the endtailing proposal to the union negotiating committee, an innocent act in which he served as the conduit for a rank and file proposal previously formulated.
 
 
 17
 Furthermore, the situation at bar is distinguishable from one involving the attribution of union officers' conduct since the Board here is using Cecil's conduct to determine the reason behind the Union's action rather than whether the action has occurred. Looking to officers' conduct in order to determine the actus reus of union misconduct is entirely appropriate. If officers' actions cannot be charged to the union, unfair labor practices would rarely be found since the union normally acts through its representatives. But to look to officer's conduct to determine the reasons for union action is not always appropriate since the officers' motivations are not always the same as the motivations of the union as a whole.
 
 
 18
 The case at hand presents an example of such disparity in motivation. The record clearly indicates that the endtailing proposal arose out of rank and file apprehension about job security, not out of a Union desire to reelect Cecil. As Member Jenkins of the Board said in his dissenting opinion to the Board order:
 
 
 19
 'Cecil advanced the proposal involving revision of the seniority provision at the insistence of the employees affected by the provision. Moreover, the membership approved the proposal before bargaining commenced. * * * (E)ven (Barton officer) Kraus realized that the proposal had extremely strong support from the employees and concluded that the union officers probably couldn't control the members on this single issue.'[13]
 
 
 20
 The evidence of rank and file motivation for the endtailing is so strong that we cannot accept the Board finding that the Union acted primarily to further Cecil's political ambitions. Since this finding is the basis for the Board's order charging the Union and Barton with unfair labor practices, the entire order must fall.
 
 III.
 
 21
 This does not necessarily end the case. If we think the Board's order may be sustained on other grounds, we must remand the case to the Board for a new determination. S.E.C. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). In this case we think sufficient grounds do exist to support a Board order and we will outline them to justify our remand and to aid the Board in its reconsideration of the case.
 
 
 22
 The record suggests that the Union acted solely on grounds of political expediency in reducing the former Glencoe employees' seniority.[14] While a union may make seniority decisions within 'a wide range of reasonableness . . . in serving the (interests of the) unit it represents,' Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1950), such decisions may not be made solely for the benefit of a stronger, more politically favored group over a minority group. To allow such arbitrary decision-making is contrary to the union's duty of fair representation which compensates employees for the opportunity to bargain for themselves which they lost when the union became the exclusive bargaining representative for the unit. See Clark, 'The Duty of Fair Representation: A Theoretical Structure,' 51 Texas L.Rev. 1119, 1131 (1973). Such conduct has been held to constitute an unfair labor practice, Truck Drivers and Helpers, Local Union 568, Teamsters v. N.L.R.B. (Red Ball Motor Freight), 126 U.S.App.D.C. 360, 379 F.2d 137, 142 (1967), or a breach of the union's duty of fair representation as developed by the courts independent of unfair labor practice proceedings. Gainey v. Brotherhood of Railway and Steamship Clerks, 313 F.2d 318, 324 (3d Cir. 1963); Hardcastle v. Western Greyhound Lines, 303 F.2d 182, 187--188 and n. 10 (9th Cir. 1962), cert. denied 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed.2d 229; Ferro v. Railway Express Agency, 296 F.2d 847, 851 (2d Cir. 1961).
 
 
 23
 Contrary to the Union's contention that no unfair labor practice can be found here since the alleged discrimination was not based on union membership or activity, the Board and the courts in recent years have consistently held that a union violates § 8(b)(2)[15] when it causes an employer to discriminate against employees on arbitrary, hostile or bad faith grounds since such conduct causes or tends to result in unlawful encouragement of union activity, Kling v. N.L.R.B., 503 F.2d 1044 (9th Cir. 1975); N.L.R.B. v. International Longshoremen's Assoc., Local 1581, 489 F.2d 635 (5th Cir. 1974), cert. denied 419 U.S. 1040, 95 S.Ct. 527, 42 L.Ed.2d 316; Truck Drivers and Helpers, Local 568, Teamsters v. N.L.R.B., supra; Miranda Fuel Co., 140 N.L.R.B. 181, 184--186 (1962), enforcement denied 326 F.2d 172, 180--186 (2d Cir. 1963) (Friendly, J., dissenting). These holdings reflect 'a recognition that the union's ability to effect this kind of discrimination is likely to have an intimidating effect on workers who might otherwise prefer to refrain from union membership or union members who might like to refrain from extensive union activity,' N.L.R.B. v. International Longshoremen's Assoc., Local 1581, supra at 638. Thus, 'Section 8(b)(2) is not concerned solely with situations where the discrimination involved is between union members and non-members or between 'good' members and 'bad or indifferent' members . . .. It applies where the union has induced the employer to discriminate on the basis of any invidious or arbitrary classification . . ..' Id. at 637. See Radio Officers Union v. N.L.R.B., 347 U.S. 17, 39--42, 74 S.Ct. 323, 98 L.Ed. 455 (1954).
 
 
 24
 Also contrary to the Union's contention, proof of good faith on the part of a union is not a defense to a charge based on the duty of fair representation since arbitrary conduct without evidence of bad faith has been held by this Circuit to constitute a breach of the duty. Orphan v. Furnco Construction Corp., 466 F.2d 795 (7th Cir. 1972); Moore v. Sunbeam Corp.,459 F.2d 811 (7th Cir. 1972). Accord, Ruzicka v. General Motors Corp., 523 F.2d 306 (6th Cir. 1975); Beriault v. Local 40, Super Cargoes and Checkers,501 F.2d 258 (9th Cir. 1974).
 
 
 25
 Furthermore, the cases cited by the Union and Barton for the proposition that the endtailing of employees from an acquired firm into a unit of employees from the acquiring firm is permissible are distinguishable from the case at bar.
 
 
 26
 Morris v. Werner-Continental Inc., 466 F.2d 1185 (6th Cir. 1972); Schick v. N.L.R.B., 409 F.2d 395 (7th Cir. 1969); N.L.R.B. v. Whiting Milk Corp., 342 F.2d 8 (1st Cir. 1965); Brady v. Consolidated Freightways Corp., 82 L.R.R.M. 2245 (S.D.Ohio 1972); Ampagoomian v. Johnson Motor Lines, Inc., 331 F.Supp. 262 (D.R.I.1971); and Keeley v. Refiners Transport and Terminal Corp., 21 L.R.R.M. 2627 (E.D.Mich.1969), all involved endtailing decisions made at the time of the initial acquisition rather than after the employees had been dovetailed into the acquiring firm's unit. In these cases the affected employees, unlike the employees in the case at bar, did not lose benefits they believed they were entitled to, nor were they prejudiced by relinquishing other employment opportunities in reliance on the dovetailing arrangement.
 
 
 27
 Associated Transport, Inc., 185 N.L.R.B. 631 (1970), involved the union revocation of a dovetailing arrangement, but unlike the case at bar, the employees did not lose expected benefits nor were they otherwise unduly prejudiced since the union never acquiesced in the initial dovetailing, which was instituted through a disputed arbitration proceeding.[16]
 
 
 28
 The only federal case in point on endtailing which we have found is Hargrove v. Brotherhood of Locomotive Engineers, 116 F.Supp. 3 (D.D.C.1953), which holds that a cause of action for a breach of the union's duty of fair representation lies when, three years after the acquisition of a firm, the union abolishes seniority rights previously given employees for pre-acquisition work with the acquired firm. This case squarely supports our conclusion that an unfair labor practice may have been committed here. See also Clark, 'The Duty of Fair Representation: A Theoretical Structure,' 51 Texas L.Rev. 1119, 1155--1160 (1973); Cox, 'The Duty of Fair Representation, 2 Vill.L.Rev. 151, 163--164 (1957).
 
 
 29
 In summary, since the established seniority rights of a minority of the Barton employees have been abridged by the 1972 collective bargaining agreement for no apparent reason other than political expediency, there seem to be sufficient grounds in this case to support the Board order. We thus are remanding the case to the Board for a determination whether the Union violated its duty of fair representation, and thus committed an unfair labor practice, by successfully negotiating for the endtailing proposal. In making its determination, the Board should consider that in order to be absolved of liability the Union must show some objective justification for its conduct beyond that of placating the desires of the majority of the unit employees at the expense of the minority.
 
 IV.
 
 30
 In addition to challenging the sufficiency of the evidence supporting the Board's ground for finding that the Union had committed an unfair labor practice, Barton challenges the Board's order on two additional grounds: (1) the failure of charges to be filed against it within the statute of limitations period, and (2) the failure of the Board to expressly find an improper motive for Barton's acquiescence in the endtailing. To aid the Board in its consideration of the charges against Barton on remand, we will discuss these issues at this time.
 
 A.
 
 31
 Section 10(b) of the Act states that 'no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board.'[17] The charge against Barton was filed on June 4, 1973, more than six months after the ratification of the contract with the endtailing provision on October 12, 1972. The Board denied Barton's claim that the complaint should have been dismissed because of Section 10(b) on the ground that the issue was not properly before the Board since Barton did not raise the issue in cross-exceptions to the Administrative Law Judge's decision, in its answer, in a brief to the Board, or at the Board hearing.
 
 Section 10(e) of the Act states in part:
 
 32
 'No objection that has not been urged before the Board, its members, agent, or agency shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.'
 
 
 33
 That such an objection must also be timely urged was made clear by the Supreme Court in U.S. v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952):
 
 
 34
 'Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'
 
 
 35
 The Board's rules specifically authorize the filing of cross-exceptions to Administrative Law Judge's decisions[18] and provide that 'no matter not included in exceptions or cross-exceptions may thereafter be argued before the Board, or in any further proceeding.'[19] It is well settled that contentions urged before the Administrative Law Judge which are not preserved in exceptions or cross-exceptions are deemed waived, absent extraordinary circumstances. N.L.R.B. v. Good Foods Mfg. and Processing Corp., 492 F.2d 1302 (7th Cir. 1974); N.L.R.B. v. Local Union 74, International Assoc. of Marble, Slate and Stone Polishers, 471 F.2d 43 (7th Cir. 1973).
 
 
 36
 Since the complaint against Barton was dismissed by the Administrative Law Judge and reinstated by the Board, Barton argues that its failure to raise the Section 10(b) issue before the Board falls within the extraordinary circumstances recognized in dicta by this Court in N.L.R.B. v. Good Foods Mfg. and Processing Corp., supra:
 
 
 37
 'Failure to file exceptions to the administrative law judge's findings sometimes is excused where those findings were favorable to the petitioner, were subsequently reversed by the Board, and petitioner had no reason to file exceptions to a decision in its favor,' 492 F.2d at 1305.
 
 
 38
 However, this statement has no application in the present case since the Administrative Law Judge did not make a favorable finding on Barton's Section 10(b) argument. When the Board reverses an Administrative Law Judge's findings favorable to a party, that party may be able to raise defenses based on those favorable findings without filing exceptions since those findings were considered by the Board when it made its decision. Cf. Lake City Foundry Co. v. N.L.R.B., 432 F.2d 1162, 1182 (7th Cir. 1970). Issues raised before the Administrative Law Judge, but not ruled upon in his order, must be presented to the Board in the form of exceptions or cross-exceptions or else the Board will not know of their existence. Barton did not do that with the Section 10(b) issue and thus cannot raise the matter in this court or on remand.[20]
 
 B.
 
 39
 We now turn to Barton's argument that the Board must specifically find that Barton acted with an improper motive before it can be found to have committed an unfair labor practice.
 
 
 40
 The Supreme Court in Radio Officers' Union v. N.L.R.B., 347 U.S. 17, 44, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954) held that:
 
 
 41
 '(S)pecific evidence of intent to encourage or discourage is not an indispensable element of proof of violation of § 8(a)(3). . . . (P)roof of certain types of discrimination satisfies the intent requirement. This recognition that specific proof of intent is unnecessary where employer conduct inherently encourages or discourages union membership is but an application of the common law rule that a man is held to intend the foreseeable consequences of his conduct.'
 
 
 42
 Since that decision the Supreme Court has attempted to delineate the types of discrimination for which specific proof of intent is not necessary. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N.L.R.B., 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); N.L.R.B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965); N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).
 
 
 43
 In Great Dane, the Supreme Court reviewed these decisions and came up with 'several principles of controlling importance':
 
 
 44
 'First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him,' 388 U.S. at 34, 87 S.Ct. at 1798.
 
 
 45
 Since there is adequate evidence on the record showing that the endtailing proposal is discriminatory conduct which has at least a 'comparatively slight' effect on employee rights, the Great Dane analysis should be applied by the Board upon remand of this case.[21]
 
 V.
 
 46
 We remand this case to the National Labor Relations Board for further consideration of the record as it stands and for a further remand to the Administrative Law Judge for the gathering of additional evidence, if necessary, in order to reach a decision in conformity with the foregoing discussion.
 
 
 47
 Enforcement denied and case remanded.
 
 
 
 [1]
 Pursuant to 29 U.S.C. § 160(f)
 
 
 [2]
 Pursuant to 29 U.S.C. § 160(e). Edward Humes, the employee who filed the charge before the Board, has intervened in this consolidated proceeding
 
 
 [3]
 29 U.S.C. § 151 et seq
 
 
 [4]
 At the time of the transfer approximately six employees were actively working at Glencoe and approximately 22 employees were on lay off (per General Counsel's Exhibit 2). Some of those on lay off had not worked at Glencoe for as long as 8 or 10 years. The record is unclear as to how many of the laid off employees were holding other jobs at the time of the transfer
 
 
 [5]
 The dovetailing plan benefited the former Glencoe employees by greatly increasing their job security, including the return to work of the laid off employees, and benefited the Barton employees by providing them the opportunity to transfer to the proposed new plant, a right which they were told they would not have if the units remained separate
 
 
 [6]
 During the same period, Barton was planning its reorganization from a corporation to a limited partnership. The impending liquidation of the corporation in order to form the limited partnership was misunderstood by many employees to portend the end of the business, hence adding to the general apprehension about job security
 
 
 [7]
 Prior to this time, a group of original Barton employees had obtained an attorney's opinion which found the dovetailing agreement not binding since it was based on an unfulfilled condition precedent--the building of the new bottling plant. Rather than take immediate action to rescind the agreement, the attorney recommended that the employees eliminate it during the next regular contract negotiations
 
 
 [8]
 The text of the new provision reads:
 'Persons employed at Distilled Spirits Plant KY--4 at August 31, 1969 and who were on the seniority list of Glencoe Distilling Company at August 31, 1969 pursuant to the Collective Bargaining Agreement between the Union and Glencoe Distilling Company shall be deemed employees covered by this Agreement as of September 1, 1969 and shall for the purposes of this Agreement, be credited with the seniority they had attained as of August 31, 1969, as such employees of Glencoe Distilling Company. Except for purposes of layoff and recall, whenever continuous service or seniority is required for benefits and practices under this Agreement, it shall be interpreted to include continuous service or seniority attained as an employee of Glencoe Distilling Company as hereinabove set forth. For the purposes of determining the order of layoff and recalls only, persons employed at Distilled Spirits Plant KY--4 at August 31, 1969 and who were on the aforesaid seniority list of Glencoe Distilling Company shall be credited with seniority commencing September 1, 1969.'
 
 
 [9]
 Per General Counsel's Exhibit 2
 
 
 [10]
 See pp. 10--11 of the Official Report of Proceedings Before the National Labor Relations Board. The most senior of the former Glencoe employees dropped from third from the top of the seniority list to 234th after endtailing and the most junior of the Glencoe employees dropped from 199th on the seniority list to 247th
 
 
 [11]
 Since the complaint against Barton was predicated on the Union's unfair labor practice, it was dismissed as well
 
 
 [12]
 If the Union is not liable, Barton cannot be held liable since the 8(a) (3) violation is predicated on an 8(b)(2) violation
 
 
 [13]
 213 N.L.R.B. No. 71, at 20
 
 
 [14]
 There is no merit to the argument raised by both the Union and Barton that the Glencoe employees received a 'windfall' as a result of the initial dovetailing which could properly be revoked. Not only is the windfall characterization an exaggeration since the dovetailing caused Glencoe employees to by-pass other employment when they came to work for Barton, but the original Barton employees voted for the dovetailing to further their own self-interest. See n. 5, supra
 The argument that the endtailing is proper since Barton's decision not to build a new bottling plant was a failure to fulfill a condition precedent to the initial dovetailing agreement also is without merit. There is no express condition precedent in the agreement itself and there is nothing in the record which suggests that the building of a new plant was an implied condition precedent.
 
 
 [15]
 Section 8(b)(2) of the Act makes it an unfair labor practice for a union 'to cause or attempt to cause an employer to discriminate against an employee in violation of Subsection (8)(a)(3).' Subsection 8(a)(3) makes it an unfair labor practice for an employer 'by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.'
 
 
 [16]
 Patton v. Globe Wernicke Co., 68 L.R.R.M. 2355 (Ohio Ct. of Common Pleas, Hamilton County, 1966) appears to support the Union and Barton's position, but the absence of analysis in the opinion and the forum in which the case was heard preclude our reliance on the decision
 
 
 [17]
 29 U.S.C. § 160(b)
 
 
 [18]
 29 C.F.R. § 102.46(e)
 
 
 [19]
 29 C.F.R. § 102.46(h)
 
 
 [20]
 Barton also claims that it did not waive the issue since it was raised in a brief to the Administrative Law Judge which was before the Board. This claim must also fall since, according to Board rules, such briefs are not part of the record before the Board. 29 C.F.R. § 102.45(b)
 
 
 [21]
 While the Great Dane case involved employer discrimination which discouraged rather than encouraged union adherence, the same analysis is applicable to the encouragement situation since Section 8(a)(3) incurs the same liability in both situations
 The two Seventh Circuit cases which Barton cites as authority for their argument that specific evidence of intent is necessary are distinguishable. Melville Confections, Inc. v. N.L.R.B., 327 F.2d 689, 692, (7th Cir. 1964) was decided before Great Dane and its requirement of independent proof of motive in all cases when 'the action complained of was not clearly discriminatory on its face as being openly and avowedly directed solely at employee activity specifically protected by the Act' has been superseded by Great Dane's requirement that the employer establish legitimate and substantial business justifications for its conduct in cases where the adverse effect on employee rights is 'comparatively slight'. If such proof is not forthcoming, independent proof of antiunion motivation is not required.
 The statements in N.L.R.B. v. Wisconsin Aluminum Foundry Co., 440 F.2d 393, 402 (7th Cir. 1971), that in Section 8(a)(3) cases, 'discrimination alone is not enough' and '(m)otivation of the employer in such discrimination is the important factor' do not support Barton's position. Not only are these statements in accord with the Supreme Court's emphasis on motive in Great Dane, but in its decision this Court held that antiunion motive could be inferred from the employer's conduct.