692 F.2d 29
 111 L.R.R.M. (BNA) 2833, 95 Lab.Cas. P 13,837
 BAKERY SALESMEN, DRIVERS, WAREHOUSEMEN AND HELPERS LOCAL
UNION NO. 51, affiliated with the International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of
America, Plaintiff-Appellant,
v.
ITT CONTINENTAL BAKING COMPANY, INC., HOSTESS CAKE DIVISION,
Defendant-Appellee.
 No. 81-1781.
 United States Court of Appeals,
Sixth Circuit.
 Argued July 28, 1982.
Decided Nov. 1, 1982.
 
 Gerry M. Miller, Frederick Perillo, Goldberg, Previant, Uelmen, Gratz, Miller, Levy & Brueggeman, Milwaukee, Wis., for plaintiff-appellant.
 David M. Hayes, David H. Paruch, Detroit, Mich., Rockford R. Chrastil, Bell, Boyd & LLoyd, Gregory T. Schroedter, Chicago, Ill., for defendant-appellee.
 Before EDWARDS, Chief Judge, MERRITT, Circuit Judge, and JOHNSTONE, District Judge.*
 MERRITT, Circuit Judge.
 
 
 1
 The sole issue on appeal in this labor case arising from a multi-employer collective bargaining agreement requires us to interpret the meaning of a contract provision on arbitration. The issue is whether a dispute concerning a long-standing company collections policy comes within the scope of a contract clause providing for arbitration of "any charge of violation of this agreement, charge of discrimination, grievance or dispute." The company policy in question makes truck drivers who sell, deliver and collect for bakery products pay for accounting discrepancies in monies collected from customers. We hold that the dispute is arbitrable and reverse the judgment of the District Court setting aside the arbitrator's decision.
 
 I.
 
 2
 Appellant, Bakery Salesmen, Drivers, Warehousemen and Helpers Local Union No. 51 (a Teamster affiliate) brought this action pursuant to Sec. 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1976), to enforce an arbitration award under a collective bargaining agreement between Local 51 and appellee, ITT Continental Baking Co., Inc., Hostess Cake Division. The District Court held that the dispute was not within the scope of the arbitration clause.[1] The Court therefore denied the union's motion for summary judgment and dismissed the complaint, a judgment which has the effect of setting aside the arbitrator's decision.
 
 
 3
 Local 51 and the company have been parties to a collective bargaining agreement covering the approximately 100 driver salesmen who distribute Hostess Cake products to retail customers in the Detroit metropolitan area. The drivers delivered baked goods to some customers with authorized charge accounts who are billed directly by Hostess Cake and to other customers who must pay the drivers in cash or by check upon delivery. These collections are turned in to the company on a daily basis at "check-in time."
 
 
 4
 The arbitration award in question concerned one aspect of the check-in procedure that the company has established for the drivers. Upon return to headquarters at the end of the day, the driver must account for and turn in his collections as well as return unsold merchandise on his truck. The driver prepares a daily settlement sheet, recording the amount of cash, checks and coins received. He deposits the money and checks into an envelope, seals it, puts his route number, the date and the amount of the deposit on the outside and signs his name to the envelope. The envelope is dropped into a chute and falls into a metal safe. The driver receives no receipt or other verification that he has in fact enclosed the money and the checks listed on the settlement sheet in the envelope.
 
 
 5
 Thereafter the driver has no further control over what happens to the envelope. The next morning, other company employees open the safe, count the envelopes and seal them in canvas bags without opening or disturbing the contents of the envelopes in any way. An armored car service delivers the canvas bags to a local bank which acts as the company's depository. Sometime later bank tellers open each envelope, and for the first time since the driver closed the envelope, the contents are counted. The tellers record on a tally sheet information including the date, individual driver deposit totals by route number, and any discrepancy between the amount listed on the outside of the envelope and what is actually inside. Drivers are charged or credited with the shortages or overages discovered by the bank tellers, regardless of amount or fault. An employee who fails to pay a shortage is suspended.
 
 
 6
 Although the procedure has been in existence for several years, Local 51 has recently sought to change the procedure because of several incidents, including the case of Tom Bowker, a driver who was required to pay a shortage that turned out to be the bank's fault. Bowker filed a grievance protesting the company's decision to require him to make up a cash shortage of $400.00 on one of his daily deposits. Bowker denied the shortage was his fault, but the company forced him to pay. Three months later a bank executive advised the company that the shortage was caused by a bank employee. Bowker was credited for the shortage and received an apology.
 
 
 7
 In another case, the company forced driver Tom Pakledinaz to pay a $600.00 shortage. His entire envelope was reported missing when company employees opened the deposit safe the next morning. He investigated and discovered that two of the checks from his envelope had been cleared through a store owned by a company supervisor. Apparently the supervisor stole the envelope and converted the contents. The supervisor was fired. The driver's shortage was forgiven and he was repaid.
 
 
 8
 As a result of these and other incidents, one of which resulted in the filing of an unfair labor practice charge, the union's secretary-treasurer filed a class action grievance protesting the check-in procedure as a company work rule or condition. After an evidentiary hearing, arbitrator Harold J. Dworkin found that no express term of the contract dealt with the company policy in question and that the subject had never been discussed in the industry-wide negotiations leading to the collective bargaining agreement. He found the dispute arbitrable and ordered the following relief:
 
 
 9
 On the basis of the evidence it is the arbitrator's finding and conclusion that it would be fair, reasonable, and practical to provide that driver salesmen be accorded some form of verification so as to assure that the summary sheet, a copy of which is included in each daily envelope, accurately corresponds with the contents as recorded by the driver salesmen.... On balance it is the opinion of the arbitrator that providing a driver salesman on a daily basis with verification in the form of an entry on his 'pink slip' or a receipt would inure to the benefit of both driver salesmen and management. It would provide a preliminary audit for correction of errors as reflected by a second count and would provide security to driver salesmen that the amounts placed in the envelopes had been accurately recorded on the summary sheets and verified by a company representative.
 
 
 10
 The arbitrator retained limited jurisdiction for six months to provide a "reasonable trial period" for the changes he ordered so that the award would remain in effect or be modified "subject to review on the basis of experience." The company refused to comply with the award. Forty days later the union commenced this action in the District Court.
 
 
 11
 The collective bargaining agreement in question has historically been negotiated on a multi-employer basis covering various commercial bakeries in the Detroit area. Neither the union nor the company negotiators ever presented proposals dealing with check-in procedures or discussed the subject at the bargaining table. Although the matter has been the subject of complaints and an unfair labor practice charge at Hostess Cake, the union viewed the dispute "essentially as a Hostess-Local 51 problem."[2]
 
 II.
 
 12
 In the instance case, we have a broad no-strike clause pending arbitration given in exchange for a broad arbitration clause. The general approach to the interpretation of such arbitration provisions in collective bargaining agreements is governed by the Steelworkers Trilogy, United States Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), in which the Court established rules of contract construction strongly favoring arbitration coverage. In American Mfg. Co., supra, 363 U.S. at 567, 80 S.Ct. at 1346, the Court said that if "there is no exception in the 'no-strike' clause" then none "should be read into the grievance clause, since one is the quid pro quo for the other." In Warrior & Gulf, supra, the Court pointed out that in such situations arbitration "rather than a strike, is the terminal point of a disagreement" and with the exception of "matters the parties specifically exclude, all the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions." 363 U.S. at 581, 80 S.Ct. at 1352. "Doubts should be resolved in favor of coverage," and arbitration "should not be denied unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Id. at 582-83, 80 S.Ct. at 1352-53. Arbitration coverage under broad provisions, the Court observed, should no longer be read as automatically excluding company policies that in the past have been considered "strictly a function of management." Id. at 584, 80 S.Ct. at 1353.
 
 
 13
 Obviously there are limitations on this broad language favoring arbitration coverage, but the District Court mischaracterized those limitations. The District Court observed that although the arbitration provision including "any disputes" is ambiguous, it would not resolve the ambiguity in favor of coverage because "the interpretation given by the arbitrator would result in the company being subject to binding arbitration on every management decision that was not expressly covered by the contract and which the union sought to modify." The District Court's view would turn the Supreme Court's rules of construction upside down because it would exclude from arbitration all disputes concerning company policies, procedures and working conditions not covered by some express term of the agreement. The Steelworkers Triology clearly contemplates arbitration of disputes not covered by the express terms of the agreement, including disputes concerning company policies, procedures and working conditions.
 
 
 14
 Instead of the approach followed by the District Court designed to protect "management functions" from encroachment, courts should follow a flexible, undogmatic approach in the interpretation of arbitration clauses, especially in the interpretation of collective bargaining agreements arising from multi-employer or industry-wide negotiations. Multi-employer negotiators tend to concentrate on basic matters of common concern to all parties in drafting the substantive provisions of contracts. They tend not to focus on local problems in the interest of securing an agreement on universal issues. As counsel for the union points out in his supplemental brief:
 
 
 15
 The exigencies of reaching a settlement will discourage either side from making proposals that are of particular interest to only one employer or to one group of employees. Because problems with this work rule have arisen only at Hostess Cake and employees at other companies might not want their check-in procedure changed, the 'milieu' [see Morris v. Warner [Werner]-Continental, Inc., 466 F.2d 1185, 1191 (6th Cir. 1972) ] in which this contract was negotiated clearly supports the arbitrator's determination that the policy grievance was arbitrable.
 
 
 16
 In short, the policy favoring arbitration espoused in the Steelworkers Trilogy applies with even greater force in situations involving local disputes governed by multi-employer agreements. Such local controversies need to be resolved by arbitration since the issues are unlikely to be addressed at the bargaining table.
 
 
 17
 It is unrealistic to say, as did the District Court, that management policy decisions are not subject to arbitration under a broad arbitration clause accompanied by a broad no-strike provision, just as it would be unrealistic to say that all such decisions are subject to arbitration. Management policies requiring salesmen to drive unsafe trucks or to sell adulterated food subjecting themselves to arrest would clearly constitute disputes subject to arbitration. Company policies regarding product pricing or the sugar content of cakes would appear just as clearly not to present arbitrable disputes. Whether an arbitration clause includes a dispute concerning company policy in the multi-employer context depends on a number of factors: (1) the language of the arbitration clause; (2) the language of the no-strike clause; (3) the language of any management rights clause; (4) how directly the company policy in question affects employee working conditions and morale; (5) how directly the policy affects the company's profit structure and stockholders; (6) whether the dispute in question is industry-wide or limited to one employer; (7) the course of any contract negotiations concerning the disputed policy; and (8) whether any substantive provisions of the contract tend to support or negate the policy in question.
 
 
 18
 Applying these factors to the disputed policy here, we find (1) the arbitration clause is broad, covering "any dispute" without express limitation; (2) the no-strike clause is broad and is given in exchange for the broad arbitration clause; (3) there is no management rights clause in the contract; (4) the policy in dispute subjects employees to false accusations of defalcation and occasionally causes unjustified employee loss and the filing of unfair labor practice charges; (5) a change of policy would affect company profits only minimally; (6) the dispute is limited to one employer in the multi-employer group; (7) there were no contract negotiations on the disputed policy; and (8) no substantive contract provisions touch on the question. Thus, the first six factors mentioned favor arbitration, and the last two factors are neutral on the question.
 
 
 19
 Taking into account these factors and the preference for arbitration coverage found in the rules of contract construction set out in the Steelworkers Trilogy, we conclude that the District Judge erred in dismissing the union's complaint seeking confirmation of the arbitrator's decision.
 
 
 20
 Accordingly, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Edward H. Johnstone, United States District Judge for the Western District of Kentucky, sitting by designation
 
 
 [1]
 The District Court held as follows:
 Although the language in the arbitration clause may be ambiguous, we do not believe it can be reasonably interpreted to allow such "interest" arbitration. The arbitrator's interpretation is such an extraordinary encroachment on the powers of management that to imply such a meaning more specific language is necessary to support it.... The interpretation given by the arbitrator would result in the company being subject to binding arbitration on every management decision that was not expressly covered by the contract and which the union sought to modify. The only way that management could establish policy would be to specifically include it in the agreement, otherwise the policy would be subject to an arbitrable decision....
 
 
 [2]
 Union president Picchi testified: "We don't seem to have it [the check-in procedure problem] as prevalent in other companies as this. I don't know. Maybe they [the other companies] use different bankers and they're all honest."