552 F.2d 1005
 94 L.R.R.M. (BNA) 3237, 81 Lab.Cas. P 13,158
 Charles DEBOLES and Virgil O. Griffis, on behalf of
themselves as Individuals and on behalf of all
others similarly situated, Appellants in
No. 76-1369,
v.
TRANS WORLD AIRLINES, INC., and International Association of
Machinists and Aerospace Workers, AFL-CIO, et al.,
Appellants in No. 76-1535.
 Nos. 76-1369, 76-1535.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 8, 1976.
Decided March 31, 1977.
 
 1
 David C. Toomey, Duane, Morris & Heckscher, Philadelphia, Pa., for Charles Deboles and Virgil Griffis.
 
 
 2
 Robert M. Landis, Gregory D. Keeney, Dechert, Price & Rhoads, Philadelphia, Pa., for Trans World Airlines, Inc.
 
 
 3
 Joseph L. Rauh, Jr., John Silard, Rauh, Silard & Lichtman, Washington, D. C., for International Association of Machinists and Aerospace Workers, AFL-CIO.
 
 
 4
 Richard Kirschner, Miriam L. Gafni, Markowitz & Kirschner, Philadelphia, Pa., for District Lodge 142 and Local Lodge 1776, IAMAW, AFL-CIO; Plato Papps, Washington, D. C., of counsel.
 
 
 5
 Before ADAMS and WEIS, Circuit Judges, and GERRY,* District Judge.
 
 
 6
 GERRY, District Judge.
 
 
 7
 Appellant Deboles represents a class of approximately 300 members[1] of the International Association of Machinists and Aerospace Workers (hereinafter "IAM") who were originally employed by appellee Trans World Airlines ("TWA") at the Kennedy Space Center in Merritt Island, Florida, for various periods of time prior to January 28, 1970. The employees alleged below that the TWA-IAM collective bargaining agreements providing the Kennedy Space Center employees with seniority rights inferior to those enjoyed by all other employee-members elsewhere in the TWA system violated the duty of fair representation implied under the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (1970), as applied to air carriers by 45 U.S.C. § 181 (1970). The employees also claimed that certain false statements by IAM officials regarding the IAM's failure to secure equal system seniority rights violated the union's duty of fair representation.
 
 
 8
 After a non-jury trial on the issue of liability, the District Court for the Eastern District of Pennsylvania[2] found that the seniority provisions of the collective bargaining agreements were not discriminatory and did not violate the IAM's duty of fair representation. The district court also found, however, that the defendant unions breached their fiduciary duty of fair representation in failing to make full and honest disclosure concerning both the nature of union efforts toward achievement of equal system seniority and the reasons why the union was unable to achieve such system seniority in misstatements to these employees in connection with the 1966 and 1970 collective bargaining agreements. TWA was held not to be liable for these untruthful statements of union officials, and a final judgment order was entered in favor of TWA.
 
 
 9
 In No. 76-1369, the plaintiff below appeals pursuant to 28 U.S.C. § 1291 from the final judgment in favor of TWA. The district court determined that there was no just reason for delay and properly entered judgment under F.R.Civ.P. 54(b), inasmuch as a single appeal from that judgment reasonably could be expected to decide the issue of TWA's liability without delaying appellate review until after the conclusion of bifurcated proceedings, not involving TWA, on the amount of damages.
 
 
 10
 In No. 76-1535, the plaintiff's class of employees and defendant unions appeal by permission of this court under 28 U.S.C. § 1292(b) from the interlocutory order determining liability in favor of the plaintiffs below and against the unions. The employees urge that the district court erred in not also finding that the collective bargaining agreement unfairly discriminated against these employees, while the unions assert that it was error to hold the unions liable for false statements in the absence of prejudicial effect upon the ultimate outcome of the ratification ballot.
 
 
 11
 We affirm the district court's finding that the seniority differences do not violate the duty of fair representation,[3] and we reverse the finding that the union is liable for false statements to these employees under the facts of this case.[4] We also affirm the finding of no liability with respect to TWA.
 
 I.
 
 12
 In February 1964, TWA entered into a contract with the National Aeronautics and Space Administration (NASA) to provide base support services at the Kennedy Space Center in Merritt Island, Florida. At the time, TWA had a collective bargaining agreement with the IAM[5] covering many employees throughout the TWA system in the aircraft industry. In early 1964, after ratification of the main collective bargaining agreement for TWA employees but before TWA's operations commenced at the Space Center, TWA and the IAM entered into a supplemental agreement applicable only to the TWA employees at the Kennedy Space Center. These employees were subject to the same series of collective bargaining agreements in 1964, 1966 and 1970, applicable to other IAM members throughout the TWA system, except as modified by supplemental agreements.
 
 
 13
 In the job classifications relevant to this action, the TWA-IAM agreement generally applied to personnel maintaining and servicing aircraft in TWA's facilities at major American airports and at the central maintenance base in Kansas City. The Kennedy Space Center employees of TWA were a small minority of the employees in TWA's national "system."
 
 
 14
 Throughout the rest of the TWA system, employees represented by IAM accrued "system seniority" since at least 1960. Generally, system seniority recognizes seniority rights which accrue from the date of entering a job classification on a regular assignment. Employees in a given job classification are ranked on a national system seniority roster based upon their length of time in the classification, regardless of the TWA location at which they work. An employee with greater system seniority who faces furlough (layoff) may displace an employee with lesser seniority in the same job classification anywhere in the TWA system. An employee with greater seniority has the right to a "preference bid" for transfer to other jobs in the same classification where vacancies exist.
 
 
 15
 The group of TWA employees at Kennedy Space Center were treated differently. Under the TWA-IAM supplemental agreement of 1964 (as extended in 1966), these employees did not enjoy the benefit of system seniority. The appellants accordingly did not accrue system seniority credit for their period of employment at the Space Center prior to January 28, 1970, at which time a new collective bargaining agreement was reached between IAM and TWA. The 1970 agreement provided that the Space Center employees would enjoy system seniority but on a non-retroactive basis. Appellants assert that the disregarding of their pre-1970 period of employment at the Space Center resulted in a situation whereby other system employees with less time in the company but greater system seniority received preference in the bidding for available positions throughout the TWA system.[6] The appellant employees allege that the denial of system seniority was designed to protect employees hired at other locations from the exercise of seniority rights by the Space Center employees.
 
 
 16
 The appellants were themselves protected, however, by provisions of the supplemental agreement which prevented senior system employees from "bumping" Space Center employees. A newly-hired Space Center employee was thus free from concern for losing his or her job to a non-Space Center person with greater seniority. A person who transferred to the Space Center from elsewhere in the TWA system was placed at the bottom of the Space Center seniority list, although system seniority credit accrued to such an employee in the event of his transfer back to the system.[7] To further discourage transfers to the Space Center, the supplemental agreement required any system employee who was accepted at the Space Center to remain for at least one year prior to bidding back into the system.
 
 
 17
 During the growth of the national space effort in the 1960's, promotions occurred significantly more rapidly for Space Center employees than for their counterparts elsewhere in the TWA system.[8] The employees already at the Space Center filled the promotion slots, since they were protected from "bidding in" by others elsewhere in the system; layoffs were rare at the Space Center, in contrast to the regular TWA stations.[9]
 
 
 18
 The district court found that in 1964 TWA opposed transfers to and from the Space Center because of its concern for a stable work force in the space program. TWA was found to be concerned about "snowbird" transfers (i. e., system employees who would use higher seniority rights to transfer to the Space Center in Florida in the winter and return to their regular post in the TWA system in the summers). The meshing of skills between the space-oriented employees in Florida and the TWA aircraft workers elsewhere was also a concern. The problems of "snowbirds" and meshing of skills were thus minimized, and a more stable work force was made possible by erecting a seniority barrier between Space Center employees and those in the TWA system.
 
 
 19
 The appellants urge that the reason for the different treatment for the Space Center was not TWA's desire for a stable work force, as the court below found, but was instead IAM's desire to protect its own members elsewhere in the system from the risk of being bumped from their positions in the event of termination of TWA's contract with NASA at the Space Center. Some support for this assertion is found in the direct testimony of TWA's Calvin Filson, negotiator of the 1964 supplemental agreement, and also in a 1964 letter by TWA's J. J. Manning, manager of labor relations at the Space Center.[10] The denial of system seniority to Space Center employees was, however, only one part of a package of special job stability provisions, described above, many of which benefited the appellants to the detriment of their system counterparts. Ample evidence supports the district court's finding that TWA's desire for a stable work force was the dominant motivation for the 1964 distinctions.[11]
 
 II.
 
 20
 The district court found that members of Local 773 (Space Center) favored elimination of system seniority restrictions from the supplemental agreement prior to the 1966 negotiations, and that officials of the IAM made several misstatements from 1966 to 1970 regarding the IAM's efforts and enthusiasm in attempting but failing to achieve this gain.
 
 
 21
 The first misstatements occurred after the 1966 negotiations failed to produce for the appellants the desired abolition of seniority restrictions. Employees at the Space Center, acting through Local 773, had submitted such a proposal to the District Lodge 142 (national) bargaining committee.
 
 
 22
 When the 1966 negotiations reached an impasse, Space Center employees, along with their TWA counterparts throughout the system, went on strike. IAM officials William J. Usery (a representative of the International, later U.S. Secretary of Labor), and Carl Gordon (District Lodge 142 assistant chairman) urged members of Local 773 to return to work to avert the danger of binding arbitration legislation then pending in a Congress concerned with delay in the space program. The district court found that Usery and Gordon also assured the Local 773 negotiators that the IAM was vigorously proposing to extend system seniority to Space Center workers at the ongoing national negotiations. The evidence also showed that Gordon and Usery said that there would be no difficulty in removing these restrictions. The Local 773 members returned to work under a tentative agreement, applicable only to the Space Center, which did not include retroactive system seniority rights. The national IAM-TWA agreement, reached four weeks later, did not eliminate the system seniority restrictions.
 
 
 23
 The assurances to Local 773 indicating IAM's expectation of success in negotiations, as well as a later statement by Gordon advising Local 773 that the District Lodge had done the best it could but that TWA had attached unacceptable strings to the proposal, were found to be misstatements constituting bad faith, inasmuch as the proposal had in fact scarcely been discussed with TWA.
 
 
 24
 The appellant urges that members of Local 773 returned to work and ratified the supplemental and national agreements in reliance upon the IAM's misstatements. The district court, however, did not so find, and the testimony of Local 773 negotiator M. J. Reilly,[12] cited by appellant, does not support the assertion of detrimental reliance. There was evidence that the Space Center employees returned to work in 1966 because the avoidance of legislation compelling arbitration was of paramount importance to both the IAM and Local 773.[13] The evidence does not demonstrate that members of Local 773, had they been told the truth in 1966 that their union would not press for the proposed seniority rights, would have refused either to end the strike or to ratify the supplemental and national agreements. Approval of the 1966 contract was recommended by Local 773's leadership, and it was ratified by the members.
 
 
 25
 The second round of alleged misstatements occurred during the 1969-70 negotiations. The Local 773 members had submitted a second proposal in 1967, again urging the IAM District negotiators to demand incorporating the Space Center employees into the TWA system with retroactive seniority. In the November, 1968, exchange of proposals, the District Lodge and TWA both favored retroactive system seniority. In May, 1969, Mr. Gordon reported that the Space Center seniority issue was "very close to settlement" but cautioned that "(a)ny full report at this time might vary from the final draft."[14] Following receipt by the IAM negotiators of a written TWA proposal to grant retroactive system seniority, two officials of District Lodge 142 (Barker and Fowler) reported to the membership of Local 773 that a retroactive system seniority agreement had been negotiated.
 
 
 26
 In August, 1969, the situation changed when the Space Center suffered its first layoffs after five years of rapid growth. The district court found that opposition to Space Center seniority grew within the IAM; petitions were circulated throughout the TWA system by members of Local 1650 in Kansas City, which had the largest membership of any IAM local lodge, with 40 per cent of the District's membership. The intra-union opposition stemmed from the fear of system employees that, in view of the imminent reductions in force at the Space Center, a retroactive grant of system seniority would result in furloughed Space Center workers bumping others with lesser seniority throughout the system. Local 773 at the Space Center, aware of this opposition, sent letters and telegrams urging support for retroactive system seniority.[15]
 
 
 27
 The negotiating committee of District Lodge 142, sensing the growing opposition to system seniority within the union, voted to remove its own proposal in late November because the committee decided that a contract with such a provision might not be ratified. The members of Local 773 were not advised of this decision; instead, IAM officials advised them that TWA was attaching a no-strike agreement to this proposal. Meanwhile, a TWA official advised several officers of Local 773 that TWA did not oppose the proposal.[16]
 
 
 28
 The final agreement implicitly rejected retroactive system seniority for the Space Center employees, and it included a provision for accrual of prospective seniority only, as suggested by James Fowler, assistant chairman of District Lodge 142. All TWA employees initially hired at the Space Center began to accrue system seniority as of the date of the contract, January 28, 1970, and received no credit for prior working years at the Space Center in the event of transfer to a station on the system.
 
 
 29
 This contract required ratification by a majority of the entire IAM union membership employed by TWA. Two ratification meetings were held for the Space Center workers of Local 773. Mr. Fowler met first with the executive board of Local 773, and then with the entire Local 773 membership, and to both groups he repeated the admittedly false statement that the union had done everything in its power to obtain retroactive system seniority, but that TWA had attached unacceptable conditions to the proposal.
 
 
 30
 The 1970 contract was found to have been advantageous to the union with beneficial pension and wage improvements and a revamped procedure for grievances and arbitration. The Local 773 membership ratified the contract, despite knowledge of the lack of a favorable system seniority provision, by a vote of 714-69, and nationally the contract was ratified by an overwhelming margin. There is no evidence that the voting outcome would have been different had the members been told the truth about the union leadership's unwillingness to achieve retroactive system seniority. Based on the total national vote, even if all Space Center voting members had voted "no," the contract would still have been ratified by a national margin of almost 3 to 1.
 
 
 31
 Finally, the trial judge found that there was no evidence of TWA's participation in the misleading and incomplete communications from the IAM to Local 773.
 
 III.
 
 32
 We first consider whether the IAM breached its duty of fair representation by favoring and entering into an agreement with TWA which provided Space Center employees with seniority rights different from those held by all other members of the union.
 
 
 33
 The origin of the doctrine of the duty of fair representation rests in the landmark case of Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), which held that a union certified under the Railway Labor Act[17] to represent all employees of a collective bargaining unit may not enter into a collective bargaining agreement which favors white union members at the expense of black non-member employees in the bargaining unit. The Supreme Court found that the Railway Labor Act requires "that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents." Id. 202, 65 S.Ct. 232. The Court went on to state that this duty does not mean that a union cannot make contracts which unfavorably affect some members, but those variations must be "relevant to the authorized purposes of the contract in conditions to which they are to be applied . . . ." Id. 203, 65 S.Ct. 232. In finding that union discrimination based upon race in a collective bargaining agreement is impermissible, the Court concluded:
 
 
 34
 (I)t is enough for present purposes to say that the statutory power to represent a craft and to make contracts . . . does not include the authority to make among members of the craft discriminations not based on such relevant differences. Id.
 
 
 35
 The early cases focused upon racial distinctions in the railroad industry,[18] but the duty was soon applied to cases of non-racial discrimination and to industries reached by the National Labor Relations Act.[19] It is clear that a union which is the exclusive bargaining agent has a federally-created statutory duty to fairly represent all members of the bargaining unit in the negotiation, administration and enforcement of the collective bargaining agreement.[20] The requirements of fair representation were summarized by the Supreme Court in Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967):
 
 
 36
 Under this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.
 
 
 37
 The case law indicates that seniority differences and seniority adjustments among employee groups governed by a single contract are within the union's discretion and judgment, so long as the seniority disadvantage is not the result of arbitrary reasons unrelated to relevant differences. Thus, seniority differences disadvantageous to a segment of a collective bargaining unit have been upheld in, e. g., Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Price v. International Brotherhood of Teamsters,457 F.2d 605 (3d Cir. 1972); and Bruen v. Electrical Workers Local 492,425 F.2d 190 (3d Cir. 1970), where the distinctions were found to fall within the range of reasonableness which governs the union's fiduciary responsibility to its members.[21]
 
 
 38
 In Ford Motor Co. v. Huffman, supra, seniority distinctions in favor of previously-employed veterans returning from war were found to be valid since the collective bargaining agreement could reasonably reward employees who had been called away from their jobs in wartime to perform services in the national interest. "Inevitably," according to the Supreme Court, "differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. . . . A wide range of reasonableness must be allowed" to the union, "subject always to complete good faith and honesty of purpose in the exercise of its discretion." 345 U.S. at 338, 73 S.Ct. at 686.
 
 
 39
 Likewise, in the context of a consolidation of the operations of two companies, the union representing the relevant employee units at both companies could validly favor a meshing of seniority to establish a master list, even though the combined seniority system disadvantaged the union members who had been employed by the younger of the two consolidated companies. Humphrey v. Moore, supra. This dovetailing of seniority lists was found to be "neither unique or arbitrary. On the contrary, it is a familiar and frequently equitable solution to the inevitably conflicting interests which arise in the wake of a merger or an absorption . . . ." 375 U.S. at 347, 84 S.Ct. at 371. In such a case of inevitable conflict, the union must be free to take a stand, even if that position is contrary to the interests of a group of members. 375 U.S. at 349-350, 84 S.Ct. 363. It is "inevitable" that the absorption, merger or elimination of one enterprise by another will hurt some employees to the extent that fewer total jobs are available.
 
 
 40
 This court's decision in Price v. International Brotherhood of Teamsters, supra, recognized the wide latitude to be accorded to the decision to dovetail seniority lists where a company decides to close down one of its operations. The joint list included employees of a closed trucking terminal, to the disadvantage of system employees with lesser seniority. This arrangement was held not to be arbitrarily discriminatory either against the junior system employees who were subsequently "bumped" or against several employees of the closed terminal who had previously transferred to the system with no seniority under an earlier agreement. The Price decision, however, depended also upon a factor not present here; namely, that the decision was reached by a joint grievance committee, the equivalent of arbitrators under the contract. Congressional policies favoring arbitration of labor disputes dictate that such a decision will not be overturned unless it is "dishonest, capricious, or beyond its authority under the collective bargaining agreement." Price v. International Brotherhood of Teamsters, supra, 457 F.2d at 611. The union committee's duty was discharged when it gave the contending sides an opportunity to make their case and then made a decision honestly and impartially. Id.
 
 
 41
 The instant case presents a closer question than existed in Price because the dispute arises from a negotiated agreement rather than an arbitrator's decision. Furthermore, unlike the dovetailing cases discussed supra, this case involves a separate seniority roster for the Space Center with endtailing of seniority upon transfer to the system prior to the 1970 contract and limited dovetailing based upon the artificial Space Center seniority date thereafter.
 
 
 42
 Nonetheless, this court is persuaded, as was the court below, that the seniority distinctions in the instant case fall within the zone of reasonableness by which a union's conduct must be measured. As discussed above, a certified bargaining agent offends the duty of fair representation if it enters a collective bargaining agreement which makes arbitrary distinctions between classes of employees within the appropriate unit which are not based on relevant differences between the employees or operations.
 
 
 43
 The district court found that the policy of denying system seniority benefits to Space Center members of IAM was a seniority distinction based upon recognition of relevant differences between the Space Center operation and the rest of the TWA system. It then found that the 1964 supplemental agreement reflected TWA's desire to minimize movement between the Space Center and the system in order to achieve a stable work force. These factual conclusions are not clearly erroneous, and therefore they are accepted by this reviewing court.
 
 
 44
 TWA's desire for a stable work force was based upon TWA's sufficiently reasonable belief that differences in skills and the prospects of "snowbird" transfers between the system and TWA would disrupt operations both at the Space Center and throughout the airline system, unless transfers were curtailed. The motivation for the separation was not arbitrary.
 
 
 45
 Furthermore, that reciprocal barriers were erected as part of TWA's separation policy in order to discourage system employees from transferring to the Space Center also demonstrates the reasonableness of the seniority distinctions. The lack of system seniority was hardly arbitrarily disadvantageous to the Space Center employees who were simultaneously protected from being "bumped" by senior system employees; the Space Center employees carried no more than a fair and reasonable share of the burden of the TWA separation policy.
 
 
 46
 The appellants argue that the seniority distinction in the instant case is indistinguishable from a discriminatory provision of the contract between TWA and IAM which was found by the Second Circuit to be invalid in Jones v. Trans World Airlines, Inc., 495 F.2d 790 (2d Cir. 1974). In Jones, the IAM and TWA agreed that certain non-union Passenger Relations Agents at Kennedy Airport in New York would henceforth be included in the unionized "Guards" classification, since both groups performed similar duties. The Passenger Relations Agents were subsumed into the Guards category, but they were given endtail seniority at the bottom of the Guards list regardless of prior length of employment with TWA. The Second Circuit held that the non-union Passenger Relations Agents were de facto members of the represented Guard unit for negotiating purposes leading to the 1970 contract, and as such they were entitled to seniority rights under the existing 1966 contract which could not be taken away discriminatorily by the union's bargaining team in the 1970 contract negotiations. 495 F.2d at 797. The court found that the only factor distinguishing the favored Guards from the disfavored former Passenger Relations Agents was the fact of prior non-membership in the union. Where the two groups performed almost identical duties prior to 1970, non-membership was an arbitrary distinction which was impermissible under the union's duty of fair representation to all members of the bargaining unit.
 
 
 47
 Jones thus stands for the limited and undisputed proposition that discrimination against non-member employees who are part of the bargaining unit is impermissibly arbitrary if no relevant distinctions exist between the union and non-union employees. The court held, 495 F.2d at 797, that "(d) iscrimination in seniority based on nothing else but union membership is arbitrary and invidious and violates the union's duty to represent fairly all members of the bargaining unit." It emphasized that "we do not suggest that a union has a duty to dovetail seniority when consolidating two groups of employees. . . . We hold only that union membership was not a proper ground for determining seniority."[22] Thus, the Second Circuit's decision can give little support to the position of the Space Center employees herein, because the distinctions in seniority did not arise from non-membership in the union but instead were related to meaningful differences between the Space Center and the airline system which were reflected in TWA's policy of discouraging transfers. 495 F.2d at 798.
 
 
 48
 Similarly, the instant action does not involve a union attempt to reduce or cancel seniority benefits already conferred upon a minority in a pre-existing agreement. See Barton Brands, Ltd. v. NLRB, 529 F.2d 793, 800 (7th Cir. 1976); Hargrove v. Brotherhood of Locomotive Engineers, 116 F.Supp. 3 (D.D.C.1953). The courts in such cases have held that the union breaches its duty of fair representation to the minority unless it can demonstrate "some objective justification for its conduct" to render such discrimination non-arbitrary.[23] The 1966 and 1970 agreements herein did not deprive the employees of any accrued seniority benefit.
 
 
 49
 The achievement of prospective system seniority in 1970, establishing an artificial 1970 seniority date for employees wishing to transfer to or from the Space Center likewise was not unfairly discriminatory. Undoubtedly, Space Center employees who transferred into the airline system after 1970 have suffered layoffs due to their artificially low system seniority, which would not have occurred if the 1970 agreement had instead reckoned system seniority retroactively from the date of entry into the employee's relevant job classification. In effect, the Space Center employees were required by the pre-1970 provisions to forego system seniority accrual in return for job security at the Space Center by means of protection from incoming transfers. This protection was hardly false or illusory. We cannot say that the 1970 agreement's failure to provide Space Center employees with retroactive system credit for the periods of work performed while receiving significant job security benefits was arbitrary, unreasonable or invidiously discriminatory.
 
 
 50
 If, on the other hand, the 1970 agreement had conferred retroactive system seniority upon Space Center employees, effectively dovetailing the existing seniority lists, the displaced low seniority system employees who had endured pre-1970 layoffs and slower promotions might equally well be heard to complain that the pre-1970 restrictions against their transfer to the greener pastures of the Space Center had unfairly discriminated against low-seniority system employees without conferring any offsetting benefit of separation.
 
 
 51
 Accordingly, we conclude that the district judge did not err when he found that the plaintiffs failed to demonstrate that the seniority differences in the 1964, 1966 or 1970 collective bargaining agreements constituted a breach by their union of the duty of fair representation.
 
 IV.
 
 52
 We next consider whether the deliberate misstatements of union officials to employees at the Space Center violated the union's duty of fair representation. As framed by the district court,[24] the question for review is as follows:
 
 
 53
 Is a union liable to a segment of its members because union officials lied to that segment of members concerning the union's efforts to secure certain seniority rights, in order to obtain membership ratification of a negotiated contract, where there is no proof that the contract would not have been ratified had those members been told the full truth?
 
 
 54
 The district court answered in the affirmative, finding union liability for the false statements. We reverse because false statements may not create liability under the federal labor laws absent a showing of tangible injury proximately resulting from the falsehood.
 
 
 55
 Although the question for review focuses upon misstatements during the course of the Space Center ratification of the 1970 contract, it is clear that the district court was influenced by what it termed a "web of deceit" by IAM officials reaching back to 1966.[25] We think that the IAM's conduct from 1966 to 1970 must be assessed by the standard required in the fair representation doctrine because we recognize that the cumulative effect of falsehoods over that period of time heightened the importance of the 1970 misstatements immediately prior to the ratification vote at the Space Center. Even the inclusion of the 1966 misstatements, however, does not alter the analysis which follows, inasmuch as the district court did not find that the IAM's 1966 promises caused injury, such as through detrimental reliance by the members at the Space Center in returning to work or ratifying the 1966 agreement. Similarly, the 1970 IAM misstatements placing the onus of compromise upon TWA, while admittedly false, were not found to have caused ratification of the contract which would not otherwise have been ratified had the truth been told.[26]
 
 
 56
 Preliminarily, we reject the IAM's claim that the duty of fair representation does not extend to union conduct in contract ratification voting. Citing the decision in Confederated Independent Unions v. Rockwell-Standard Co., 465 F.2d 1137 (3d Cir. 1972), the union would foreclose liability in post-negotiation intra-union balloting. In that case, the court rejected a claim that federal law affords employees the right to approve or reject the contract negotiated by the union on their behalf, holding:
 
 
 57
 The law does not require that a collective bargaining agreement be submitted to a local union or the union membership for authorization, negotiation or ratification, in the absence of an express requirement in the agreement, or in the constitution, by-laws or rules and regulations of the union (citations omitted). 465 F.2d at 1140.
 
 
 58
 The converse, however, is also true: federal law does require a ratification vote if the union constitution or by-laws require it. In the instant case, the 1970 ratification vote was required by the union constitution.[27] We see no reason why the fiduciary duty of fair representation, inasmuch as it applies to the negotiation, administration and enforcement of the collective bargaining agreement, should not be applied with equal force to union conduct in the ratification process where such ratification is required by the agreement or by the constitution, by-laws or rules and regulations of the union.
 
 
 59
 Although it is clear that a bargaining agent must be honest and forthright in dealings with its members, and "as the statutory representative of the employees (it) is 'subject always to complete good faith and honesty of purpose in the exercise of its discretion,' Ford Motor Co. v. Huffman,supra, (345 U.S.,) at 338, (73 S.Ct., at 686, 97 L.Ed., at 1058.)" Hines v. Anchor Motor Freight, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976), the federal courts have consistently required a direct nexus between breach of this duty and resultant damages to the individual or minority segment as an element of liability. For example, in Hines v. Anchor Motor Freight, supra, the Supreme Court found that an erroneous arbitration decision could not stand, despite the strong policy of labor law favoring the finality of arbitration of grievances when so provided in a collective bargaining agreement, if "the employee's representation by the Union has been dishonest, in bad faith or discriminatory" so as to "seriously undermine the integrity of the arbitral process." Id. 571, 567, 96 S.Ct. 1060, 1058. The union's breach of duty must be found to have "contributed to the erroneous outcome of the contractual proceedings." Id. 568, 96 S.Ct. 1058.
 
 
 60
 Similarly, in Humphrey v. Moore, supra, a group of employees alleged inadequate union representation in a seniority dispute which was submitted to a joint conference committee for resolution after a hearing. The Supreme Court rejected this contention because the employees failed to demonstrate "that the result would have been different had the matter been differently presented." 375 U.S. at 350-351, 84 S.Ct. at 372.
 
 
 61
 The decisions of this court, while requiring a union's conduct toward its members to adhere to the fiduciary standards inherent in its position as bargaining agent, Brady v. Trans World Airlines, Inc., 401 F.2d 87, 94 (3d Cir. 1968), cert. denied, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969), have nonetheless implicitly required a demonstration of injury to the members proximately caused by the breach.[28]
 
 
 62
 Furthermore, numerous labor law decisions limiting relief only to redress of specific injuries and refusing to impose punitive sanctions also indicate that liability in the instant case may not be found in the absence of injury proximately caused by the misrepresentations. In the absence of such injury, any remedy against the union would necessarily be a "punishment" for a harmless lie. Punitive damages have been consistently rejected in unfair labor practice cases under the National Labor Relations Act, see Republic Steel Corp. v. NLRB, 311 U.S. 7, 10-12, 61 S.Ct. 77, 85 L.Ed. 6 (1940); Carpenters Local 60 v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961); NLRB v. United States Steel Corp., 278 F.2d 896, 900-901 (3d Cir. 1960), cert. denied, 366 U.S. 908, 81 S.Ct. 1083, 6 L.Ed.2d 234 (1961); in actions for recovery of tortious damages under § 303 of the Labor-Management Relations Act, 29 U.S.C. § 187, Teamsters Local 20 v. Morton, 377 U.S. 252, 260-261, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); and in actions arising under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, United Shoe Workers v. Brooks Shoe Mfg. Co., 298 F.2d 277 (3d Cir. 1962) (per curiam en banc), in which Chief Judge Biggs, concurring, found that "it is the general policy of the federal labor laws, to which the federal courts are to look for guidance in Section 301 actions, to supply remedies rather than punishments." Id. 284.[29]
 
 
 63
 There is no indication that the Railway Labor Act deviates from this general pattern of remedies, at least with respect to union misconduct. Reballoting is the statutory remedy for instances where a vote has been impaired by misconduct of the carrier. Section 2 (Ninth) of the Railway Labor Act, 42 U.S.C. § 152 (Ninth). Criminal sanctions are imposed by Section 2 (Tenth) of the Act upon carriers (and not unions) but only with respect to willful failure or refusal of a carrier to comply with the certain of the Act's duties, such as the duty to refrain from interference with the organization chosen by the employees. 42 U.S.C. § 152 (Tenth).
 
 
 64
 We need not decide whether any circumstances exist in which a punitive-type remedy on behalf of employees against a union for union misconduct might be implied under the Railway Labor Act. In the absence of actual injury occasioned by the union's wrongful misstatements, imposing liability in the instant case would be punitive and discordant with the limited remedies available under the Act.
 
 
 65
 In conclusion, we hold that liability for a labor union's deceptive conduct in breach of the fiduciary duty of fair representation arises only if the breach directly causes damage to an individual or group to whom the duty is owed. There is no liability in this case where false statements by union officials concerning the union's efforts and bargaining position did not materially affect the result of the subsequent ratification vote.
 
 V.
 
 66
 The judgment of the district court in No. 1369 will be affirmed. The judgment of the district court in No. 1535 will be reversed, and the cause will be remanded for further action consistent with this opinion.
 
 
 
 *
 John F. Gerry, United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 The instant class was certified by the district court pursuant to F.R.Civ.P. 23(b)(2). Counsel for appellants have informed the court that the co-plaintiff below, Virgil O. Griffis, has terminated his employment with TWA and discontinued his interest in the case
 
 
 [2]
 Deboles v. Trans World Airlines, Inc., Civil No. 71-2945 (Oct. 31, 1975) (Hon. Donald W. VanArtsdalen). The opinion and order appear at App. 1384a-1406a
 
 
 [3]
 See part III, infra
 
 
 [4]
 See part IV, infra
 
 
 [5]
 The IAM Grand Lodge or International is the certified bargaining representative of the relevant bargaining unit of TWA employees in this case. The International was named as defendant below along with IAM District Lodge 142 (the subordinate national body of the International, representing TWA and Ozark Airlines employees). The Local Lodges represent employees at each operation in each city; defendant Local 1776 in Philadelphia represents TWA employees at the station from which appellant Deboles was laid off; Local 773 was the Kennedy Space Center Lodge. Unless otherwise indicated, "IAM" will hereinafter refer to the International and the District Lodge collectively
 
 
 [6]
 The disadvantage of lack of pre-1970 system seniority is illustrated by the work history of appellant Deboles. He had been hired at the Space Center in February, 1968, but under the 1970 contract he accrued seniority only for periods of work after January, 1970. He voluntarily transferred to the TWA station in Los Angeles in May, 1970, and worked as a stores clerk there for a year. He was displaced to the Philadelphia station and worked for several months until he was laid off. His position was held by an employee who entered the stores clerk classification later than February, 1968, but before Deboles' seniority date of January, 1970. Deboles continues in furlough status
 
 
 [7]
 The 1966 modification of the supplemental agreement made changes favorable to the appellant-employees. Workers hired originally at the Space Center could bid for vacancies on the system after one year on a "preference" basis, that is, without displacement rights but with preference over new hires at a system station. A worker transferring to the Space Center, on the other hand, could not enjoy re-transfer privileges back to the system in any job classification to which he or she had been promoted while at Space Center
 
 
 [8]
 After TWA operations at the Space Center commenced on April 1, 1964, employment grew from 300 to about 2,000, of which 70% were represented by the IAM. During the nearly 7 years of TWA operations, only 60 to 90 employees transferred from the system to the Space Center. Higher classifications and lead position slots abounded at the Space Center, where employees reached positions customarily in a few months which would have taken years to achieve in the system. For example, in the regular system it took about 8 years for an employee to advance from stores clerk to the position of mechanic, while from 1964-1970, Space Center stores clerks made the same jump in an average of 7 months
 
 
 [9]
 Seasonal layoffs were customary in the TWA system, but because of protection from incoming transfers the Space Center employees enjoyed stability and growth unknown elsewhere in the system. Many employees at the Space Center worked uninterruptedly during most of the pre-1970 period, while their more senior counterparts elsewhere in the system were on layoff. The first layoff at the Space Center did not occur until August, 1969
 
 
 [10]
 Filson's testimony (App. 167a-168a) and Manning's 1964 letter to the general chairman of District Lodge 142 (App. 1535a) indicated their belief that Section 5(b) of the 1964 supplemental agreement (restricting system seniority rights but allowing for a preference for furloughed Space Center employees over new hires at system stations) "was primarily addressed to a furlough of employees in the event of termination of TWA's (contract) with NASA." The district court apparently gave little weight to Filson's testimony in view of Filson's admittedly poor memory of the events of 1964 (see, e. g., App. 168a-171a, 198a-199a, 207a-208a)
 Section 5(b) of the supplemental agreement reads as follows (App. 1483a):
 New employees hired for the (Space Center) operation, who do not have seniority rights at another point, shall not be listed on the system seniority roster and shall not be permitted bid or displacement rights elsewhere on the TWA system. In the event of furlough, such employees shall, however, be permitted to file a Request for Consideration form for vacancies on the TWA system which are not filled by employees listed on the TWA-IAM system seniority roster. These requests may be filed at any time and withdrawn at any time prior to the opening of a vacancy, and shall automatically expire on January 1 and July 1 of each year. When the furloughed employee is selected for a vacancy, the Company shall notify him only at the last address filed with the Company, and he must report on the date specified, unless an extension of time is mutually agreed to. Any furloughed employee who does not file or renew a Request for Consideration, or who fails to accept a position requested, shall have his name removed from the (Space Center) operation seniority roster. An employee filling a vacancy under this provision will not receive credit for previous seniority accrual.
 That Section 5(b) may have been "primarily addressed" to furlough procedures does not compel the conclusion that the overall policy of restricting employee movement to and from the Space Center was at the behest of concerned system employees. Although part of Section 5(b) restricts seniority upon transfer from the Space Center, its motivation cannot be assessed in a vacuum. Elsewhere in the supplemental agreement it is clear that TWA could refuse an application for transfer to the Space Center "for operational reasons" (Section 4(b), App. 1483a), unlike voluntary transfers or promotions between stations on the TWA system which were generally granted as a matter of seniority alone. (See Art. VI of main collective bargaining agreement, App. 1472a-1479a). TWA's operational concerns were thus evidenced in the supplemental contract itself, as well as in the negotiations which produced the contract (see note 11 infra ).
 
 
 [11]
 Testimony of Mr. Filson (App. 239a-243a) detailed TWA's fears of disruption by employment swings if employment at the Space Center operation were fully integrated with the rest of the TWA system. Problems of seasonal system layoffs, the prospect of temporary mass migration of aircraft line station employees to the Space Center, and the difficulty of meshing work skills between the aircraft-oriented system and the missile-launching operations were company concerns articulated by TWA during the 1966 negotiations. See App. 1533a-1534a (minutes of 1964 negotiations) and App. 132a-133a, 139a-140a (deposition testimony of D. C. Crombie, TWA's vice president for industrial relations). According to Mr. Crombie:
 Our (TWA's) objective was to provide a certain segregation of the (Space Center) work group because we felt that the job of putting together a work force down there from the beginning and rising rapidly to 1500, 2000 people, was quite a difficult job under the time stringencies of the agreement . . . with the Government.
 We wanted to have assurances that those people would be a relatively stable group of people when we got them on and when they became experienced they would stay and they wouldn't be fleeing to Kansas City and Los Angeles. . . . I am talking now in terms of company objectives.
 App.139a-140a.
 
 
 [12]
 App. 493a-501a
 
 
 [13]
 App. 494a-495a
 
 
 [14]
 See App. 1634a-1635a, 512a-513a, 701a-702a. Mr. Gordon was the chief negotiator for IAM in the discussions leading to the 1970 contract
 
 
 [15]
 Petitions opposing retroactive seniority bearing some 2,900 signatures were submitted to the IAM leadership by TWA employees at Kansas City, New York and Los Angeles. In response to the petitions, a member of the District Lodge negotiating team went to New York and Kansas City and reported back that a contract providing retroactive system seniority for the Space Center would not be ratified due to heavy opposition
 
 
 [16]
 Whether TWA actually offered any opposition to the proposal by attaching "strings" is unclear. The district court found that the "primary reason" that retroactive system seniority was not achieved was "the fear and the risk that the contract would not be ratified because of opposition by TWA workers at other system locations" (App. 1393a). TWA was found to have "included such a proposal in the early negotiations and at no time strongly opposed such a provision" (App. 1402a). The union points out that TWA's negotiator was still asking for a no-strike requirement for the Space Center as late as January 12, 1970 (App. 1161a, 1204a-1205a), the day before final sign-off by the International and TWA. Nonetheless, ample evidence supports the district court's finding that IAM negotiators withdrew their proposal for retroactive system seniority and that only the proposal for prospective seniority, as suggested by Fowler of the District Lodge, received consideration by the negotiators during the weeks prior to final agreement in January, 1970
 
 
 [17]
 As in Steele v. Louisville & Nashville R.R. Co., supra, the union herein was the certified bargaining, representative under § 2 (Fourth) of the Railway Labor Act, 45 U.S.C. § 152 (Fourth) (1970)
 
 
 [18]
 Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949)
 
 
 [19]
 See Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955)
 
 
 [20]
 The development of this important labor law doctrine has been chronicled elsewhere and need not be repeated here. See Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 563-567, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); Vaca v. Sipes, 386 U.S. 171, 177-188, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 342, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Bazarte v. United Transp. Union, 429 F.2d 868, 871-872 (3d Cir. 1970); Brady v. TWA, Inc., 401 F.2d 87, 94 (3d Cir. 1968), cert. denied sub nom. IAM v. Brady, 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969); see also Clark, The Duty of Fair Representation: A Theoretical Structure, 51 Texas L.Rev. 1119 (1973); Cox, The Duty of Fair Representation, 2 Vill.L.Rev. 151 (1957)
 
 
 [21]
 Other cases finding non-arbitrary reasons for seniority distinctions based on relevant differences include: NLRB v. Whiting Milk Corp., 342 F.2d 8 (1st Cir. 1965); Hiatt v. New York Central R.R., 444 F.2d 1397 (7th Cir. 1971); Augspurger v. Brotherhood of Locomotive Engineers, 510 F.2d 853 (8th Cir. 1975); Laturner v. Burlington Northern, Inc., 501 F.2d 593 (9th Cir. 1974), cert. denied, 419 U.S. 1109, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975); Northeast Master Executive Council v. CAB, 165 U.S.App.D.C. 36, 506 F.2d 97 (1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975)
 
 
 [22]
 Jones v. TWA, Inc., supra, is part of a well-established line of fair representation cases which have determined that discrimination based upon non-membership in the union is unreasonable and arbitrary. See Steele v. Louisville & Nashville R.R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (involved discrimination against Negroes who were non-members of the union); Radio Officers' Union v. NLRB, 347 U.S. 17, 46-48, 74 S.Ct. 323, 98 L.Ed. 455 (1954) (concerned wage discrimination against non-members of representative union); see generally Clark, The Duty of Fair Representation: A Theoretical Structure, 51 Texas L.Rev. 1119 (1973)
 
 
 [23]
 Barton Brands, Ltd. v. NLRB, supra, 529 F.2d at 800. Endtail seniority has been upheld in numerous cases where the endtailing was not arbitrarily discriminatory, such as in consolidations where it is held not unreasonable to endtail the employees of the newly acquired or defunct operations. See, e. g. NLRB v. Whiting Milk Corp., 342 F.2d 8 (1st Cir. 1965); Morris v. Werner-Continental, Inc., 466 F.2d 1185 (6th Cir. 1972), cert. denied, 411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973); Schick v. NLRB, 409 F.2d 395 (7th Cir. 1969)
 
 
 [24]
 See Opinion and Order (Jan. 30, 1976) (entering Rule 54(b) final judgment and certification for 28 U.S.C. § 1292(b) interlocutory appeal), App. 1424a, 1428a
 
 
 [25]
 App. 1402a. The district court, after tracing the development of fair representation doctrine, recounted the instances of deceitful statements to Space Center employees from 1966 onward, as discussed herein in Part II, supra
 
 
 [26]
 Although conceding that there is no proof that the IAM's misstatements colored the outcome of the vote to ratify the 1970 contract, the employees assert (in Reply Brief for Appellants at 17-19) that they nonetheless were damaged because the misstatements covered up the union's conduct. Had they known the truth, they now say, they might have challenged the union's original recognition as bargaining representative, or they might have sought separate representation. Such speculative, post hoc reasoning does not suffice to demonstrate concrete injury caused by the misstatements absent supporting evidence in the record below
 
 
 [27]
 The IAM concedes that, a strike vote having been approved in 1969, the contract ratification vote was required by Art. VIII, § 4 of the IAM Constitution. Brief for Cross-Appellant Unions at 26 n.9
 
 
 [28]
 For example, in Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3d Cir. 1968), the jurisdictional decision of a joint union-management committee in a seniority dispute was found to be arbitrary and unreasonable. This court was persuaded that the union's neutrality may have deprived the losing segment of effective advocacy of their position before the joint committee. Citing Humphrey v. Moore, supra, 375 U.S. at 351, 84 S.Ct. 363, the court found a sufficient probability that "the result would have been different had the matter been differently presented," 396 F.2d at 40, thus establishing the nexus to injury occasioned by the procedure which produced the erroneous decision
 Similarly, in Brady v. TWA, Inc., supra, 401 F.2d at 99-100, the union's refusal to accept Brady's past dues and consequent wrongful expulsion of Brady from the union was found to be the direct cause of Brady's loss of employment.
 
 
 [29]
 See also the much-quoted statement of Judge Learned Hand who ruled in Western Union Telegraph Co. v. NLRB, 113 F.2d 992, 997 (2d Cir. 1940) that liability under the labor law must rest on "proof that 'the unfair labor practice' actually impinged upon the putative victims and caused them pecuniary damage."