**Vincent A. MAOILO, et al., Plaintiffs,**

v.

**Ray KLIPA; Local 1408, United Steelworkers of America; Lynn Williams; United Steelworkers of America; United States Steel Corporation, Defendants.**

**Civ. A. No. 85–2124.**

United States District Court,
W.D. Pennsylvania.

March 11, 1987.

Claudia Davidson, Pittsburgh, Pa., Arthur Z. Schwartz, New York City, for plaintiffs.

Richard J. Brean, Asst. General Counsel, United Steelworkers of America AFL–CIO, CLC, Pittsburgh, Pa., for United Steelworkers.

S.G. Clark, Pittsburgh, Pa., for U.S. Steel Corp.

## OPINION

GERALD J. WEBER, District Judge.

Plaintiffs, members of defendant Union Local, seek to set aside the July 7, 1985 vote of the membership approving a special local agreement negotiated to sustain the life of U.S. Steel's National Works. Plaintiffs allege a laundry list of irregularities which, it is argued, cumulatively establish a violation of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(1) and the Union's duty of fair representation under the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. Plaintiff also alleges that the International ratified and approved the Local's improper conduct, and that U.S. Steel implemented the new contract despite knowledge of the flaws in its approval. Plaintiffs also seek damages from all defendants.

The parties have now filed cross motions for summary judgment addressing a host of issues. We consider several of these to be dispositive and we address them below.

## FACTS

U.S. Steel operates the National Steel Works at McKeesport, PA, and Local 1408 of the USWA is the collective bargaining unit for employees of the plant. At the times relevant here, U.S. Steel and the USWA were parties to a nationwide basic labor agreement (BLA) which covered the National Works.

National's recent history has not been a happy one. U.S. Steel has scaled down operations at the plant in recent years, resulting in sharply declining employment. Heavy losses continued, however, and in early 1985, U.S. Steel demanded concessions from Local 1408, including a further reduction in force and restructuring of the seniority system. The Company threatened the complete shutdown of National works as the consequence of refusal.

Under the pressure of U.S. Steel's ultimatum and a June 28, 1985 deadline imposed by the Company, Local 1408's newly-elected President, Ray Klipa, began negotiations with the Company on a local agreement for the National Works. When the June 28 deadline passed, the Damoclean sword of a shutdown did not fall, but U.S. Steel kept it dangling over the Union's head as negotiations continued.

Naturally the negotiations were of great interest to membership and late in June 1985, several members, including one named-plaintiff, requested a meeting. In accordance with union by-laws requiring a

meeting within 10 days of the request, local leadership scheduled the meeting for July 7, 1985.

Notice of the meeting was effected in several ways. The following Notice was posted on plant bulletin boards and handed to employees as they reported for work:

Local Union—1408

SPECIAL MEETING

SUNDAY—July 7, 1985

TIME—12:00 NOON TO 4:00 PM

PLACE—LOCAL 1408 UNION HALL

SUBJECT OF DISCUSSION

THE PENDING SENIORITY, MANNING

AGREEMENT, AND MUTUAL PENSIONS FOR

NATIONAL WORKS.

Klipa also granted an interview to a reporter of the McKeesport Daily News, a newspaper of general circulation in the communities surrounding the National Works. The stories appeared in the paper in the week preceding the meeting, one of them on the front page. While the notice posted at the plant did not mention a vote, the newspaper articles indicated that a vote would be taken, and Klipa orally advised members of the vote as he handed out notices at the plant entrance.

It is undisputed that all active employees received notice of the meeting, either by one of the above methods or by word of mouth. However, plaintiffs complain that many laid-off employees, those supposedly with the most to lose under the new agreement, did not receive any notice of the meeting.. Plaintiffs also complain that Local Union officials made telephone calls to several employees likely to favor the proposal, urging their attendance and votes in favor.

The meeting was held as scheduled on July 7, 1985 at the union meeting hall. Turn-out was especially heavy and the meeting room was inadequate to hold the crowd. Some members, the number is disputed, had to stand in an adjoining room during the meeting. Plaintiffs allege that these members were unable to hear some or all of the proceedings.

At the meeting, local union officials made available to members copies of those provisions which had been worked out with the Company. There is no dispute that this was represented as part, but not all of a potential agreement. Due to the large crowd, the supply of copies of the proposed agreement ran out. However, President Klipa opened the meeting by reading each of the provisions aloud. This was followed by an extended and often heated period of discussion, question and answer, and debate.

At some point in the meeting, Anthony Maiolo, a named plaintiff here, made a motion from the floor to table the vote on the proposed agreement until further details could be obtained. President Klipa refused to accept the motion or put it to a vote, but instead proceeded with a membership vote on the proposed agreement.

Plaintiffs allege that the membership vote was flawed in several respects. Plaintiffs contend that improper sign-in procedures and inadequate efforts to ascertain active membership of voters resulted in voting by inactive members. Plaintiffs also complain that a specific class of inactive members, those laid-off over two years, were permitted to vote in violation of union rules.

Plaintiffs contend that the actual process of marking ballots was improper because it was not secret and it exposed members to the intimidation of union officials. Each member came to the front of the room where he was given a ballot to be marked "Yes" or "No". Although this was done in the room in the presence of union officials and other members, defendants contend there was no intimidation and no difficulty in concealing one's vote.

The membership approved the proposal by a 243 to 198 margin. In the days following the meeting, negotiations continued on the details of an agreement including lines of progression and job classification of crafts. Defendants claim that the

achievement of an agreement was in doubt until the very date the agreement was signed, July 10, 1987. President Klipa, as Grievance Committee Secretary, and Anthony Klenak as Grievance Committee Chairman executed the agreement on behalf of the Local as authorized by the by-laws.

Following the signing, U.S. Steel began to phase in the new agreement. After a period of cross-training and other adjustments, the seniority restructuring, special retirements and reduction in force were implemented.

## I. APPLICATION OF DUTY OF FAIR REPRESENTATION.

Plaintiffs have alleged that the union defendants by their conduct have violated their duty of fair representation, but defendants argue that this duty does not extend to advisory votes such as that taken July 7, 1985.

Defendants cite *DeBoles v. Trans World Airlines, Inc.*, 552 F.2d 1005 (3d Cir.1977), but the citation is wholly inapposite. That Court affirmed the duty's application to binding ratification votes but did not deny its application to advisory votes.

■ Indeed, the *DeBoles* decision notes that the duty of fair representation attaches to the negotiation, administration and enforcement of the collective bargaining agreement, and cannot logically be absent in ratification votes. The Court also recognized that a union always has the obligation to deal with its members in good faith. It is likewise nonsensical to suggest that a union must negotiate a contract in good faith but may manipulate an advisory vote on the contract with impunity. We therefore conclude that the union owed membership a duty of fair representation in the conduct of the July 7, 1985 vote, whether binding or advisory.

■ Of course under this obligation the union cannot be liable for negligence or poor judgment, but only for bad faith or arbitrary conduct. *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir.1970). Because the proof requirements are so uniquely high, such cases are often susceptible to disposition on summary judgment. *Liotta v. National Forge Co.*, 473 F.Supp. 1139 (W.D.Pa.1979); *Siskey v. General Teamsters*, 419 F.Supp. 48 (W.D.Pa.1976).

Here the circumstances of the various alleged irregularities based on the undisputed facts of record and viewed in the light most favorable to plaintiffs, fail to raise any specter of bad faith or arbitrary conduct.

■ It is clear from the record that the manner and forms of notice employed by the union were proper and adequate. Union by-laws required notice by "posting *or* other reasonable means." Here, Local 1408's leadership posted a printed notice on plant bulletin boards, distributed handbills to workers as they reported to work, and arranged for publication of the pertinent information in the area's principal newspaper. All of this was done against a backdrop of lengthy negotiations which had been the subject of much conversation among members for weeks. It is also undisputed that the Local had employed these same means of providing notice for *30 years* without complaint. There is no glimmer of bad faith or arbitrary conduct in this record.

■ Plaintiffs fault Local officials for failing to specify in the notices that a vote would be taken at the meeting. While the posted notices did not refer to a vote, the newspaper articles did, and defendant Klipa orally informed members of the vote as he passed out handbills. Even so, there is no provision in Union by-laws requiring specific notice of a vote and the law does not impose one. *Aikens v. Abel*, 373 F.Supp. 425 (W.D.Pa.1974).

■ Plaintiffs complain that several members who were likely to vote "Yes" on the proposed agreement were called by Local officials and urged to attend. First of all, we see no prohibition against efforts by Local Union officials working for passage of what in their view is a desirable agreement. More importantly though, plaintiffs' own evidence reveals that each of these

specially contacted members had learned of the meeting by other means, so no detrimental impact derives from this conduct.

■ Plaintiffs complain that an insufficient number of copies of the agreement were made available at the meeting. However, this was due to an unexpectedly large turn-out and was not due to any wrongful conduct of the defendants. Furthermore, Local President Klipa opened the meeting by reading the provisions aloud over a microphone. Even if some members could not hear, there is nothing to indicate any bad faith on part of the Union defendants.

■ Similarly the overflow crowd which was forced to stand in an adjoining room was not the fault of Union officials' bad faith or arbitrary conduct. Defendants could have just as likely been excluding potential supporters as dissenters, but in any event a microphone was available. There is nothing to indicate a benefit to the defendants in an overcrowded room and the mere fact that some members could not hear does not rise to bad faith or arbitrary conduct.

Alleged omissions in the sign-in and credentials check likewise carry no indication of bias or possible benefit to defendants. A sign-in and credentials check was conducted which on the facts submitted appears adequate and without bias.

■ Plaintiffs complain that 18 inactive members, laid off more than 2 years but less than 5, who ordinarily have no voting rights, were allowed to vote here. However, plaintiffs' own arguments reveal that these persons were within the class most likely to vote *against* the proposal. In fact, this alleged breach would appear to have inflated the "No" votes, making the final tally appear closer than it was. It is also undisputed that the membership by acclamation agreed to permit these members to vote after a request by a member. This was not the result of actions by defendants.

■ Plaintiffs complain that the requirement that each member step forward when called, take and mark a ballot in presence of Union officials and members was intimidating. However there is no requirement that votes be secret, and plaintiffs have not identified a single individual who even considered altering his vote due to ther manner of voting. The circumstances certainly did not intimidate 198 voters.

The most troublesome allegation is that defendant Klipa refused to accept and put to vote a motion to table by plaintiff Maiolo. Defendants have asserted that the refusal to accept a motion to table was procedurally correct and prompted by Klipa's fear of a plant closing if any further delay occurred. Plaintiffs have not seriously challenged this explanation and have advanced nothing to indicate a bad faith motive in Klipa's insistence on a vote.

■ It is clear from all evidence of record that plaintiffs cannot satisfy the heightened standard of bad faith or arbitrary conduct required by 29 U.S.C. § 185. Summary judgment is therefore appropriate on plaintiffs' claims of breach of the duty of fair representation.

## II. APPLICATION OF LMRDA.

Plaintiffs assert a claim under § 101(a)(1) of the LMRDA:

### (a)(1) Equal rights

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws.

29 U.S.C. § 411(a)(1). Defendants contend that the present case is not within the class that this section was intended to reach.

Defendants argue that the July 7, 1985 vote was not an "election" or "referendum" within the meaning of the Act. Defendants rely on other provisions of the Act which employ the term "election" solely with regard to selecting union officers, and the term "referendum" solely with regard to votes on dues increases.

■ Defendants' position is contrary to the overwhelming weight of authority extending LMRDA protection to other voting rights, particularly votes on contracts. E.g. *Trail v. International Brotherhood of Teamsters*, 542 F.2d 961, 966 (6th Cir. 1976); *Black v. Transport Workers Union of America*, 454 F.Supp. 813, 821 (S.D.N.Y. 1978). Defendants' restrictive view is also at odds with the Act's legislative purpose, to "promote the full and active participation by the rank and file in the affairs of the union." *American Federation of Musicians v. Wittstein*, 379 U.S. 171, 85 S.Ct. 300, 13 L.Ed.2d 214 (1964).

Defendants also contend that this section of the Act is limited in application to instances of class based discrimination, and since no discrimination in voting occurred here, and no class of members was prevented from voting, this claim should be dismissed. Defendants rely almost exclusively on *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964).

However we do not read *Calhoon* as narrowly as defendants do, and again the great weight of authority is against them. *Calhoon* itself states that the Act protects the rights of "members and classes of members." *Id.*, at 139, 85 S.Ct. at 295. It is also clear that the Act was intended to guarantee more than the simple right to cast a ballot. The Act also prohibits the more subtle machinations and manipulations which are intended to deprive a member's vote of its meaning. E.g., *Sheldon v. O'Callaghan*, 497 F.2d 1276 (2d Cir.1974) (union leadership refusal to allow dissenting members to do a mailing to membership deprived plaintiffs of a "fair referendum"); *Bunz v. Moving Picture Machine Operators Union*, 567 F.2d 1117 (D.C.Cir.1977 (union lowered percentages of vote needed to pass amendment, after amendment was defeated in earlier vote).

■ Plaintiffs allegations of insufficient notice, lack of adequate information, solicitation of potential "Yes" votes, intimidation of potential "No" votes, and other irregularities raise the question of whether defendants deprived plaintiffs' votes of their meaning. In fact, even if we accept de-

fendants' view of *Calhoon*, the allegations raise the prospect of discrimination against a class of members, that is younger members with less seniority. In short then, the LMRDA applies, if plaintiffs can establish the facts alleged. However, plaintiffs have a more serious problem establishing a causal relation to damages.

### III. DAMAGES AND CAUSATION.

■ Although inappropriately cited by defendants for another purpose, *DeBoles*, 552 F.2d 1005 (3d Cir.1977) is worthy of citation for the premise that a plaintiff must establish damages directly related to the asserted violation. Without an injury causally related to the alleged breach, there can be no cause of action. *Id.*, at 1018–19.

In *DeBoles*, union officials misled membership over several years concerning certain seniority rights. However, plaintiffs could not show that the election or the resulting contract would have been any different had the membership known the truth. In short, the Court, following *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), required plaintiff to show that in absence of the violations, the result would have been different.

Although *DeBoles* concerned a claim for breach of the duty of fair representation, its premise is equally applicable to the LMRDA claim.

■ Here plaintiffs must establish an issue of fact as to whether the July 7, 1985 vote and the collective bargaining agreement would have been any different in the absence of the alleged violations. We conclude that plaintiffs cannot satisfy the burden and summary judgment is therefore appropriate on plaintiffs' claims under both the LMRA and LMRDA.

Much of the previous discussion on fair representation applies here. The means of notice were in excess of that required by the by-laws and by any measure were reasonable and adequate. The special telephone notice to several prospective "Yes" votes had no impact on causation because all those persons had received notice by

other means. The absence of a sufficient quantity of copies was ameliorated by Klipa reading the provisions aloud. Votes by inactive members were, by plaintiffs' own theory, more likely to be "No" votes. There is no evidence of record that the room size, sign in procedures or manner of voting affected a single vote, or that they favored potential "Yes" votes.

But the most telling element in this question of injury and causation is in the nature of the July 7, 1985 vote. Plaintiffs claim it was a binding ratification of a tentative agreement, while defendants contend that it was solely advisory and could not bind the Local's negotiators. Plainly this is critical. If the vote was advisory, it left the discretion in the hands of the Local's president who believed this contract was the only way to avert a plant closing.

In this context it is important to note that a binding arbitration vote was not required by the union constitution or by-laws and in the absence of such provisions is not required by law. *Confederated Independent Union v. Rockwell Standard Co.*, 465 F.2d 1137 (3d Cir.1972); *Goclowski v. Penn Central Transportation Co.*, 545 F.Supp. 337 (W.D.Pa.1982), aff'd 707 F.2d 1401 (3d Cir.1983). Furthermore, no binding ratification vote on a contract had been held by this Local in 30 years.

Plaintiffs argue that even though the vote was not required, President Klipa voluntarily submitted the issue to the membership for a binding vote. In support plaintiffs recite the newspaper article quoting Klipa as saying that the membership was entitled to have some voice in their future.

Klipa's statements are equivocal at best, as consistent with an advisory vote as a binding one. Plaintiffs fail to present any authority to indicate that Klipa had the power to submit to a binding ratification vote. But more importantly, the undisputed fact is that at the time of the July 7, 1985 meeting, there was simply no contract to vote on.

Negotiations had been proceeding between Klipa and the Company's representative when several members requested a special meeting. Union rules required scheduling within ten days and on July 7, 1985, the day of the meeting, the parties had not reached an agreement.

What was presented to membership on July 7, 1985 were two pages of provisions, agreeable to the parties, which would be the *basis* for a contract. However, as became clear at the meeting, several important issues were unresolved and were to be the subject of further negotiation. Plaintiffs complain that Klipa often responded to questions by saying that he did not have an answer yet because he had not worked out that particular aspect with the company. Rather than being a violation of duties under the LMRA or the LMRDA, this is clear and undisputed evidence that the July 7, 1985 vote was advisory. The membership was not considering a contract, but a fragment representing the course of still ongoing negotiations.

We conclude therefore that plaintiffs are unable to establish that the July 7, 1985 vote would have come out differently in the absence of the alleged violations, or that the subsequent contract would have been any different. Because plaintiffs are unable to establish that the alleged violations were the cause of their alleged injuries, summary jugment is appropriate.

## IV. INTERNATIONAL UNION AND U.S. STEEL.

Plaintiffs' claims against these defendants derive from the claims against the Local Union Defendants, and all claims against them will therefore be dismissed.